284 F.3d 518
 SOUTH ATLANTIC LIMITED PARTNERSHIP OF TENNESSEE, LP; South Atlantic Income Properties, LLC; South Atlantic Management Company, Plaintiffs-Appellants,
E. Stephen Stroud; Grace D. Ramsey; Steven M. Simpson, Third Party Defendants-Appellants,
v.
David R. RIESE; Gary Plichta; Gibraltar Companies of Tennessee, Incorporated; Gibraltar Companies, Incorporated, Defendant & Third Party Plaintiff-Appellees.
David R. Riese; Gary Plichta; Gibraltar Companies of Tennessee, Incorporated; Gibraltar Companies, Incorporated, Defendant & Third Party Plaintiff-Appellants,
v.
E. Stephen Stroud; Grace D. Ramsey; Steven M. Simpson, Third Party Defendants-Appellees,
South Atlantic Limited Partnership of Tennessee, LP; South Atlantic Income Properties, LLC; South Atlantic Management Company, Plaintiffs-Appellees.
South Atlantic Limited Partnership of Tennessee, LP; South Atlantic Income Properties, LLC; South Atlantic Management Company, Plaintiffs-Appellants,
E. Stephen Stroud; Grace D. Ramsey; Steven M. Simpson, Third Party Defendants-Appellants,
v.
David R. Riese; Gary Plichta; Gibraltar Companies of Tennessee, Incorporated; Gibraltar Companies, Incorporated, Defendant & Third Party Plaintiff-Appellees.
 No. 99-1497.
 No. 99-1552.
 No. 99-1987.
 United States Court of Appeals, Fourth Circuit.
 Argued October 30, 2001.
 Decided March 22, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ARGUED: E.D. Gaskins, Jr., Michael Joseph Tadych, Everett, Gaskins, Hancock & Stevens, Raleigh, North Carolina, for Appellants. Sean Eric Andrussier, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Raleigh, North Carolina, for Appellees.
 ON BRIEF: Pressly M. Millen, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Raleigh, North Carolina, for Appellees.
 Before WIDENER, TRAXLER, and KING, Circuit Judges.
 Affirmed by published opinion. Judge King wrote the opinion, in which Judge Widener joined. Judge TRAXLER wrote an opinion concurring in part and dissenting in part.
 OPINION
 KING, Circuit Judge.
 
 
 1
 These consolidated appeals arise out of a failed business relationship between several real estate developers in North Carolina and Tennessee in the mid-1990s. In early 1993, David Riese and Gary Plichta (the "Riese Group") joined forces with E. Stephen Stroud, Stroud's wife Grace Ramsey, and Steve Simpson (the "Stroud Group") to form the South Atlantic Limited Partnership of Tennessee ("SALT" or the "SALT Partnership"), a company dedicated to developing real estate in the Nashville, Tennessee, metropolitan area. The SALT Partnership then hired Gibraltar Companies, Incorporated ("Gibraltar"), a construction company owned by the Riese Group, to serve as its general construction contractor, and SALT began developing an upscale apartment community near Nashville known as Lexington Apartments (the "Lexington Project" or the "Project").[1]
 
 
 2
 Over time, the relationship between the two Groups became strained, and, in May 1996, the Stroud Group expelled the Riese Group from SALT due to alleged poor construction and financial impropriety. Litigation thereafter ensued in the Eastern District of North Carolina, with the two Groups asserting a myriad of claims against one another, including breaches of contract, breaches of fiduciary duties, and violations of the North Carolina Unfair Trade Practices Act ("UTPA").[2]
 
 
 3
 A jury trial was conducted in the Eastern District of North Carolina in November 1998, and, on November 19, 1998, the jury rendered a split verdict, finding that Gibraltar had breached its construction contract with the SALT Partnership, that the Riese Group had breached various fiduciary duties it owed to SALT, and that both Groups had engaged in unfair and deceptive trade practices. Following the submission and briefing of post-trial motions, the district court upheld the jury's determinations in their entirety. The two Groups, as well as the various corporate parties, have appealed adverse aspects of the court's judgment. For the reasons explained below, we affirm.
 
 I.
 A. The Agreements
 
 4
 In early 1993, the Riese Group entered into discussions with the Stroud Group about the possibility of investing in the Lexington Project. In July 1993, the parties reached an understanding that the Stroud Group would own seventy-five percent of the Lexington Project and the Riese Group would own the remaining twenty-five percent. Pursuant to this understanding, the Stroud Group formed SALT, a development company structured under a limited partnership agreement (the "SALT Partnership Agreement" or the "Partnership Agreement").[3] On April 15, 1994, the members of the Riese Group became limited partners in the SALT Partnership, receiving their combined partnership interest of twenty-five percent. SALT then purchased the real estate in Nashville on which the Lexington Project was to be developed.
 
 
 5
 Under the provisions of the SALT Partnership Agreement, none of the SALT partners were to be paid salaries; their sole source of compensation was to be any income derived from the sale or lease of SALT's properties. The SALT Partnership Agreement also established procedures for the expulsion of a "defaulting partner" who, inter alia, "by misconduct or willful inattention to the business welfare of the Partnership seriously injur[es] the business of the Partnership." Under the SALT Partnership Agreement, whether any such misconduct had occurred was to be "determined reasonably and in good faith by the unanimous decision of the nondefaulting partners." If the nondefaulting partners decided that such misconduct had occurred, they had the right, within six months thereof, to expel the defaulting partner from the SALT Partnership by majority vote. If the nondefaulting partners decided to expel a defaulting partner, they were required, pursuant to the SALT Partnership Agreement, to do the following: (1) send written notice of expulsion to the defaulting partner, and (2) pay the defaulting partner "book value, as determined by `generally accepted accounting principles,'" of his partnership interest in SALT, calculated as of the date of expulsion.[4] Other than these two procedures, the Partnership Agreement contained no other requirements for removal of a partner from SALT.
 
 
 6
 After the April 15, 1994, amendments to the SALT Partnership Agreement to include the Riese Group, the two Groups executed, on May 4, 1994, a Memorandum of Agreement which established their respective responsibilities for development of the real estate in Nashville.[5] Under the Memorandum of Agreement, SALT agreed to use Gibraltar as the general contractor for the construction of its development projects. Upon SALT's selection of real estate for development, Gibraltar was obligated to generate a "control package" for each particular project, i.e., a budget estimating and itemizing the costs that would be incurred during the development of a project to its leasing stage. In turn, SALT agreed to pay Gibraltar three percent of the "hard construction costs," i.e., the actual construction costs (such as grading or foundation work), for supervising a project's construction.[6] The Memorandum of Agreement also provided that Gibraltar would inform SALT of any activities "which impact [the] viability, cost, time of construction or which might otherwise have any material affect on" a development project.
 
 
 7
 With the two Groups having executed their Memorandum of Agreement, Gibraltar began work on generating the control package for the Lexington Project. In August 1994, Gibraltar completed the control package, which was required before SALT could obtain financing for the Project. The control package estimated that the Project would cost $14,030,000, and that it would be finished in eighteen months. Gibraltar and SALT then executed, on August 15, 1994, a formal construction contract for the Lexington Project (the "Construction Contract"). Pursuant to the Construction Contract, SALT agreed to pay Gibraltar the actual cost of the Project's construction, plus the sum of one dollar.[7] The Construction Contract specified, in a manner consistent with the control package, that the Project was to be substantially completed eighteen months after the commencement of construction.
 
 
 8
 While they were concluding negotiations on the Construction Contract, SALT and Gibraltar were also negotiating with First Union National Bank to obtain a construction loan. This loan, in the sum of $14,020,000, was closed, pursuant to a Loan Agreement, on August 18, 1994, three days after Gibraltar and SALT executed the Construction Contract.[8] Under the Loan Agreement, SALT was obliged to submit monthly draw requests to First Union, thus drawing down the loan to pay for the Project's monthly construction costs. SALT would then pay Gibraltar, as the Project's general contractor, and Gibraltar in turn would pay the Project's subcontractors and vendors. Although SALT possessed responsibility for preparing the monthly draw requests, the parties informally agreed that the Riese Group would handle the Project's finances. As a result, the Riese Group assumed responsibility for the Project's accounting, and it agreed to provide SALT with monthly budget reports.
 
 B. The Disputes
 
 9
 The construction of the Lexington Project was initially scheduled to begin in August 1994, immediately after the loan closing; thus, the Project was to be completed eighteen months later in approximately February 1996. Work on the Project, however, did not commence until October 1994, and it immediately encountered a number of problems and delays. First of all, Gibraltar discovered that its engineers had miscalculated the topography over a large portion of the Project's Nashville construction site, and the grading and preparation of the construction site proved much more difficult than anticipated. In addition, Gibraltar retained a framing subcontractor, called Today's Contractors, which performed substandard framing work on the Project, and which then walked off the job.[9] Gibraltar also encountered difficulty in obtaining the necessary government permits for construction of the Project. Because of these problems, the quality of construction at the Project suffered substantially, and the Project fell behind its construction schedule. These problems, along with a variety of others, increased the total construction cost of the Lexington Project, and by the end of 1995 its estimated cost had been revised upwards by $1,221,000, to a total of $15,251,000.
 
 
 10
 During the year 1995, Stroud personally visited the Project on three occasions, and each time he expressed increasing concern with the quality and pace of construction. The two Groups held multiple meetings on the status of the Project, and the Riese Group repeatedly assured the Stroud Group that Gibraltar would complete the Project on schedule and under budget. Finally, after construction totally ceased for a week in January 1996, Gibraltar resigned as general contractor, and it turned over the Project's financial records to SALT.[10] SALT then hired Raven Construction Company, a general contractor owned by the Stroud Group, to complete the Project. Raven successfully completed construction of the Project in August 1996, six months later than originally scheduled.
 
 
 11
 In early 1996, in the course of completing the Lexington Project and reviewing its finances, the Stroud Group discovered that Gibraltar and the Riese Group had engaged in financial improprieties during construction. An audit revealed that Gibraltar, in its involvement with the Project, had:
 
 
 12
 (1) billed SALT for supervisors who had not been working at the construction site;
 
 
 13
 (2) double-billed various travel expenses;
 
 
 14
 (3) submitted inflated statements from subcontractors and pocketed the difference; and
 
 
 15
 (4) established a sham payroll processing corporation, Universal Benefits, that charged fees to SALT for handling the monthly payroll.
 
 
 16
 As a result of the audit's disclosures, the Stroud Group, in April 1996, made several requests to the Riese Group for a refund of the monies that Gibraltar had improperly taken; in addition, it requested that the Riese Group assume responsibility for cost overruns, poor construction, and delays that had occurred while Gibraltar served as general contractor for the Project. The Riese Group, however, denied involvement in any financial improprieties, refused the requests of the Stroud Group for the refund of monies, and contended that the construction work on the Project was in conformity with the Project's plans and specifications.
 
 
 17
 Thereafter, on May 14, 1996, the Stroud Group notified the Riese Group that it had been expelled from the SALT Partnership, pursuant to the Partnership Agreement's expulsion provision, for "misconduct and/or willful inattention to the business welfare of the partnership" that had seriously injured SALT. The Riese Group's twenty-five percent partnership interest in SALT was formally terminated as of May 31, 1996. As a result, the Riese Group received no compensation for its one-fourth interest in the Project, because, according to the Stroud Group, the book value of SALT at the end of May 1996 was less than zero, i.e., SALT's liabilities exceeded its assets.
 
 
 18
 On June 11, 1996, eleven days after expulsion of the Riese Group, the SALT Partnership entered into an agreement with Prudential of America ("Prudential") to sell the Project for $17,640,000, and it also agreed to sell to Prudential a yet-to-be built "Lexington II" Project for $25,200,000. Prudential had been negotiating with SALT for its purchase of the Project since early 1995, and in February 1995 it had executed a general letter of intent with SALT to buy the Project. Indeed, Prudential had sent Stroud a proposed purchase contract on January 24, 1996, offering to buy the Project for $17,640,000. The sale of the Project to Prudential, which was consummated in September 1996, netted SALT a profit of approximately $1,200,000.
 
 C. The Litigation
 
 19
 On October 25, 1996, SALT filed this civil action against the Riese Group and Gibraltar in the Eastern District of North Carolina, alleging multiple claims of fraudulent conduct.[11] Specifically, SALT asserted that (1) the Riese Group had committed civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962(a)-(d), (2) the Riese Group and Gibraltar had engaged in unfair trade practices in violation of North Carolina's UTPA, (3) the members of the Riese Group had breached their fiduciary duties to SALT, and (4) Gibraltar had breached the terms of the Construction Contract. In response, the Riese Group and Gibraltar promptly moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the civil RICO claims for failure to state claims upon which relief could be granted. The district court denied their motion to dismiss on February 18, 1997, and thereafter, on February 28, 1997, the Riese Group and Gibraltar filed a joint answer to SALT's complaint. They denied SALT's allegations; they raised a number of affirmative defenses; and they also asserted a counterclaim against SALT for breach of the Construction Contract. In addition, they filed counterclaims and third-party claims against SALT and the Stroud Group for (1) breach of the Partnership Agreement, (2) breach of fiduciary duties, (3) unfair and deceptive trade practices in violation of North Carolina's UTPA, and (4) unjust enrichment.
 
 
 20
 The two Groups then filed cross-motions for summary judgment. SALT and the Stroud Group sought summary judgment on the various affirmative defenses asserted by the Riese Group and Gibraltar, and on two of the Riese Group and Gibraltar's counterclaims and third-party claims: (1) unfair and deceptive trade practices and (2) unjust enrichment. On the other hand, the Riese Group and Gibraltar sought summary judgment on SALT's civil RICO claims and sought dismissal of SALT's supplemental state law claims. On September 8, 1998, the district court denied summary judgment to the Riese Group and Gibraltar, but granted summary judgment to SALT and the Stroud Group with respect to all claims and defenses except on the counterclaim of the Riese Group and Gibraltar for unfair and deceptive trade practices. Thus, the litigation proceeded to trial on all of SALT's claims against the Riese Group and Gibraltar, and on the Riese Group and Gibraltar's remaining four claims (i.e., the claims for breach of the Construction Contract, breach of the Partnership Agreement, breach of fiduciary duties, and unfair and deceptive trade practices) against SALT and the Stroud Group.
 
 
 21
 The jury trial was conducted from November 9, 1998 through November 19, 1998, in the Eastern District of North Carolina. Given the complexity of the litigation, the Verdict included ten pages of special interrogatories.[12] After its deliberations, the jury found, in substance, as follows:
 
 
 22
 (1) the Riese Group was not liable on the civil RICO charges;
 
 
 23
 (2) Gibraltar had breached the Construction Contract;
 
 
 24
 (3) the Riese Group had breached various fiduciary duties to SALT; and
 
 
 25
 (4) the Riese Group and Gibraltar had engaged in unfair and deceptive trade practices.
 
 
 26
 The jury therefore awarded SALT the sum of $1,100,000 from Gibraltar for breach of contract, the sum of $1.00 from the Riese Group for breach of fiduciary duty, and the sum of $150,000 from the Riese Group and Gibraltar for unfair and deceptive trade practices. Thus, the total damage award to SALT was in the sum of $1,250,001. With respect to the counterclaims and third-party claims of the Riese Group and Gibraltar, the jury found, in substance, that:
 
 
 27
 (1) SALT had not breached the Construction Contract;
 
 
 28
 (2) SALT and the Stroud Group had not breached the SALT Partnership Agreement;
 
 
 29
 (3) SALT and the Stroud Group had not breached any fiduciary duties owed to the Riese Group; but
 
 
 30
 (4) SALT and the Stroud Group had engaged in unfair and deceptive trade practices.
 
 
 31
 The jury therefore awarded the Riese Group and Gibraltar damages in the sum of $300,000, from SALT and the Stroud Group, for unfair and deceptive trade practices.
 
 
 32
 The various parties then filed post-judgment motions, including, inter alia, to have the district court determine that the jury's findings of unfair and deceptive trade practices deemed violations of the UTPA as a matter of law. Under the UTPA, the determination of whether a particular action constitutes an unfair or deceptive trade practice is a question of law. Ellis v. Northern Star Co., 326 N.C. 219, 388 S.E.2d 127, 131 (1990). As the Supreme Court of North Carolina explained recently, in Gray v. North Carolina Insurance Underwriting Association, "[o]rdinarily, once the jury has determined the facts of a case, the court, based on the jury's findings, then determines, as a matter of law, whether the defendant engaged in unfair or deceptive practices in or affecting commerce." 352 N.C. 61, 529 S.E.2d 676, 681 (2000).
 
 
 33
 On March 10, 1999, the court granted the motions and, pursuant to the UTPA, trebled the damage awards made to SALT, on the one hand, and to the Riese Group and Gibraltar, on the other, for the unfair and deceptive trade practices.[13] The trebled awards were in the sums of $450,000 to SALT, and $900,000 to the Riese Group and Gibraltar, respectively. South Atlantic Ltd. P'ship of Tenn. v. Riese, Memorandum Opinion at 8-9, 21-23, 5:96CV901H1 (E.D.N.C. Mar. 10, 1999) ("Opinion"). Thus, SALT's total damage award was increased to the sum of $1,550,001, and the Riese Group and Gibraltar's total damage award was increased to the sum of $900,000.[14] Opinion at 25. In addition, the Riese Group moved, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, to set aside, as a matter of law, the jury's finding that they had breached fiduciary duties to SALT. The court, however, concluded that there was substantial evidence to support the jury's finding on this point, and therefore denied the Riese Group's motion. Id. at 18-19, 529 S.E.2d 676.
 
 
 34
 The parties have appealed various adverse aspects of the jury verdict and the Opinion, with SALT and the Stroud Group filing a notice of appeal on April 9, 1999, and the Riese Group and Gibraltar filing a cross-appeal on April 22, 1999. First, SALT asserts that the court's instruction to the jury on the elements of civil RICO was improper because it misstated the applicable law. Second, the members of the Riese Group challenge the court's denial of judgment as a matter of law on whether they possessed and breached a fiduciary duty to SALT. Finally, both Groups contest the court's determination that they committed unfair or deceptive trade practices within the meaning of North Carolina law. We possess jurisdiction pursuant to 28 U.S.C. § 1291, and we address these issues in turn.[15]
 
 II.
 
 35
 The first issue we address on appeal is SALT's challenge to the jury instruction on its unsuccessful civil RICO claims. In order to succeed on a civil RICO claim, a plaintiff must prove by a preponderance of the evidence that the defendant engaged in a pattern of racketeering activity. 18 U.S.C. § 1962(c). In SALT's case, the alleged underlying racketeering activity against the Riese Group was a series of violations of the mail and wire fraud statutes. SALT contends that the court, in instructing on mail fraud, failed to incorporate the Supreme Court's holding in Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), and that it consequently misled the jury into believing that the Riese Group was required to engage in fraudulent communications in order to have contravened the mail or wire fraud statutes. In Schmuck, the Court had specifically rejected this position, and it held that the mailings in a mail fraud prosecution must merely further the scheme to defraud. Id. at 712-15, 109 S.Ct. 1443. SALT asserts that the confusion generated by this contested instruction misled the jury into finding no civil RICO liability on the part of the Riese Group.
 
 A.
 
 36
 We review challenges to jury instructions for abuse of discretion. Nelson v. Green Ford, Inc., 788 F.2d 205, 208-09 (4th Cir.1986). Instructions are adequate if "construed as a whole, and in light of the whole record, [they] adequately [inform] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir.1987). Even if instructions are flawed, there can be no reversal unless the error seriously prejudiced the challenging party's case. Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1296 (4th Cir.1995).
 
 B.
 
 37
 In order to establish a civil RICO violation under 18 U.S.C. § 1962(c),[16] the evidence must be sufficient to prove by a preponderance that the enterprise was conducted through a pattern of racketeering activity. In this case, the alleged racketeering activities were mail and wire fraud, proscribed by 18 U.S.C. §§ 1341 and 1343 respectively.[17] The court detailed the requirements of mail fraud to the jury,[18] and went on to give the jury a similar instruction on wire fraud.[19] Before so doing, however, the court instructed the jury on the defense of good faith, advising it:
 
 
 38
 Good faith is a complete defense to mail fraud. Good faith means the defendant had a genuine belief that the information which was sent or given was true.
 
 
 39
 In giving its instruction on the good faith defense, the court was acknowledging the legal principle that mail fraud requires that a defendant act with specific intent to defraud. United States v. Godwin, 272 F.3d 659, 666 (4th Cir.2001). As such, "good faith, or the absence of an intent to defraud, is a complete defense to a charge of mail fraud." United States v. Martin-Trigona, 684 F.2d 485, 492 (7th Cir.1982); see also United States v. Dunn, 961 F.2d 648, 650 (7th Cir.1992) ("Good faith, or the absence of an intent to defraud, constitutes a complete defense to a charge of mail fraud."); United States v. Alkins, 925 F.2d 541, 549-50 (2d Cir.1991) ("Good faith is a complete defense to a mail fraud charge. If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to defraud.") (citation omitted); United States v. Williams, 728 F.2d 1402, 1404 (11th Cir.1984) ("Good faith is a complete defense to the element of intent to defraud.").
 
 
 40
 On appeal, SALT challenges the sufficiency and correctness of the mail and wire fraud instructions, asserting that they did not adequately represent the holding of the Court in Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In that decision, the Court held that the mailings in a mail fraud prosecution merely had to further the scheme to defraud, and that they need not, in and of themselves, contain fraudulent misrepresentations. Id. at 712, 109 S.Ct. 1443 ("[A] mailing that is incident to an essential part of the scheme ... satisfies the mailing element of the mail fraud offense.") (quotation and citation omitted). SALT maintains that the instructions failed to make this point explicitly, and it therefore asserts that the jury may have been confused by the "good faith" instruction, such that the jury may have believed that the mailings themselves were required by law to be fraudulent. SALT contends that the court erred in not accepting its proposed instruction, which would have specifically included the admonition that "[i]t is not necessary that Plaintiffs prove ... that the material transmitted by mail or wire was itself false or fraudulent."
 
 
 41
 Although the instruction proposed by SALT is more explicit than that given by the court, a court is not obligated to accept all proposed jury instructions. Hardin, 50 F.3d at 1296. In examining in isolation the mail and wire fraud instructions given by the court, there may be some potential for confusion — for example, the court's statement in its good faith instruction that a "genuine belief that the information which was sent or given was true" could create an impression that the communication itself is required to be fraudulent. As we have noted, however, we do not examine instructions in isolation; rather, we view them in the context of the entire jury charge. Spell, 824 F.2d at 1395. Examined in this light, it is clear that this jury was "adequately informed... of the controlling legal principles," without being misled or confused to the prejudice of SALT. Id. The court explicitly instructed the jury that the mailing only had to be "in furtherance of some essential step" of the fraud and that the wire communication merely had to be "advancing, or furthering the scheme to defraud." The court made no specific assertion that the communications themselves had to be fraudulent. Moreover, as we observed, good faith is an absolute defense to mail fraud; thus, the instructions as given by the court represent entirely accurate statements of law. As such, the challenged instructions fully comport with the requirements of our decision in Spell v. McDaniel, 824 F.2d 1380 (4th Cir.1987), in that, viewed in the context of the entire jury charge, they adequately informed the jury of the controlling legal principles.
 
 III.
 
 42
 The second issue we address is the Riese Group's contention that the district court erred in denying its Rule 50(b) motion for judgment as a matter of law on whether it had breached fiduciary duties it owed to SALT. Opinion at 18-19. In this regard, the jury found that development of the Lexington Project arose out of a fiduciary relationship between the Riese Group and the other SALT partners, and that the Riese Group had breached its fiduciary duties. The members of the Riese Group assert that, as limited partners in the SALT Partnership, they lacked sufficient domination and influence over SALT's affairs to owe any fiduciary duties to the other SALT partners, and that they were accordingly entitled to judgment as a matter of law.
 
 A.
 1.
 
 43
 We review de novo a district court's denial of a motion for judgment as a matter of law. Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 279 (4th Cir. 1999). A district court should grant a Rule 50(b) motion only if the court "determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." Id. In reviewing a district court's decision on a Rule 50(b) motion, "we view all the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in his or her favor." Id.
 
 2.
 
 44
 Under North Carolina law, a fiduciary relationship "may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Stone v. McClam, 42 N.C.App. 393, 257 S.E.2d 78, 83 (1979) (quoting Abbitt v. Gregory, 201 N.C. 577, 160 S.E. 896, 906 (1931)). In order to allow the imposition of fiduciary duties where they are found justified, the North Carolina courts have historically declined to adopt a rigid definition of a fiduciary relationship; however, they have recognized that business partners are each others' fiduciaries as a matter of law. HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 403 S.E.2d 483, 489 (1991).
 
 B.
 
 45
 The members of the Riese Group challenge the jury finding that they breached fiduciary duties to SALT, maintaining that, as limited partners in SALT, they lacked the requisite domination and influence to create any such fiduciary obligations. In support of this proposition, they primarily rely on Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir.1998), and Abbitt v. Gregory, 201 N.C. 577, 160 S.E. 896 (1931), and assert that a fiduciary relationship arises only when "one party figuratively holds all the cards — all the financial power or technical information." Broussard, 155 F.3d at 348. Because the Riese Group possessed only limited control over SALT's decisionmaking capacities, it contends that it was not sufficiently powerful to meet this standard.
 
 
 46
 In making this argument, the Riese Group misapprehends the law of North Carolina. The standard laid out in Abbitt v. Gregory is that a fiduciary relationship not only encompasses "all legal relations, such as attorney and client, broker and principal, ... partners, [or] principal and agent," but also includes "any possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other." 160 S.E. at 906 (emphasis added). Thus, the domination and influence requirements are relevant only in situations when there is no legal relationship that imposes fiduciary duties on the parties to it. In essence, those requirements relate to contractual situations between two parties who are dealing with each other on an arms-length basis. As the Riese Group observes, North Carolina is reluctant to impose "extra-contractual fiduciary obligations" in the context of general commercial contracts; thus, even when parties to an arms-length transaction have reposed confidence in each other, no fiduciary duty arises unless one party thoroughly dominates the other. Tin Originals, Inc. v. Colonial Tin Works, Inc., 98 N.C.App. 663, 391 S.E.2d 831, 833 (1990). In this case, however, any fiduciary obligations possessed by the members of the Riese Group arise out of their role as limited partners in SALT, rather than from arms-length contractual relations. As we have noted, Abbitt found the domination and influence requirements relevant to situations in which no fiduciary duties were imposed by a legal relationship. 160 S.E. at 906. Thus, even accepting that the members of the Riese Group did not thoroughly dominate SALT, we must nevertheless examine whether they possessed fiduciary obligations in their role as limited partners.
 
 
 47
 The Riese Group correctly observes that North Carolina law has not specifically addressed the question of whether limited partners owe fiduciary duties to general partners, and it also rightly asserts that North Carolina treats limited partners as analogous to shareholders in other legal contexts. Energy Investors Fund, L.P. v. Metric Constructors, Inc., 351 N.C. 331, 525 S.E.2d 441, 443 (2000); Jackson v. Marshall, 140 N.C.App. 504, 537 S.E.2d 232, 235 (2000). As such, the Riese Group may be correct in its assertion that a limited partner generally has no more of a fiduciary duty to a partnership than a shareholder has to a corporation. In this case, however, the members of the Riese Group exercised substantially more control over the SALT Partnership than a typical shareholder exercises over a corporation's affairs. Thus, regardless of whether limited partners normally owe fiduciary duties to the partnership, SALT reposed a "special confidence" in the Riese Group that gave rise to a fiduciary relationship.
 
 
 48
 The SALT Partnership Agreement provides that a limited partner may be "a contractor for or an agent or employee of the Partnership," may consult with and advise the general partner on the business of the SALT Partnership, and may act as a surety for the SALT Partnership. Moreover, outside the terms of the Agreement, the Riese Group informally agreed to handle the accounting for the Project. Thus, even though the Agreement specified that limited partners should take no part in the management or conduct of SALT, as a practical matter the Riese Group possessed substantial authority over SALT's affairs. In particular, in taking control of the accounting for the Project and in preparing draw requests for the First Union loan, the Riese Group was clearly occupying a position "where there [was] a special confidence reposed." Abbitt, 160 S.E. at 906. As such, the Riese Group had an obligation to "act in good faith and with due regard to the interests of the one reposing confidence [i.e., the SALT Partnership]." Id. At trial, ample evidence was presented for the jury to conclude that the Riese Group abused this trust, and that it did not handle the financial responsibilities entrusted to it with due regard to SALT's well-being. As such, considering the trial evidence in the light most favorable to SALT, there was substantial evidence to sustain the jury's finding that the Riese Group breached fiduciary duties it owed to SALT.
 
 IV.
 
 49
 The final issues on appeal involve the cross-challenges by the Stroud Group and the Riese Group to the district court's conclusion that they had each committed unfair and deceptive trade practices under North Carolina's UTPA. Both these Groups maintain that, as a matter of law, their conduct was not sufficiently egregious to violate the UTPA. We will address each of their assertions in turn, but we must first review some of the general legal principles governing the North Carolina UTPA.
 
 A.
 
 50
 In an action for unfair or deceptive trade practices under North Carolina's UTPA, the "occurrence of the alleged conduct, damages, and proximate cause are fact questions for the jury, but whether the conduct was unfair or deceptive is a legal issue for the court." Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 902 (4th Cir.1996); see also Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 529 S.E.2d 676, 681 (2000). Thus, under North Carolina law, when a jury determines that a defendant committed the alleged conduct, it is then the duty of the court to determine whether, as a matter of law, such conduct constituted an unfair or deceptive trade practice. In reviewing these issues on appeal, we stand in the shoes of the district court; therefore we review the court's judgment de novo. Gilbane, 80 F.3d at 902. On the other hand, we review the jury's findings that the alleged conduct occurred in the light most favorable to the prevailing party, and "[i]f, with that evidence, a reasonable jury could return a verdict in favor of plaintiffs, the court must defer to the judgment of the jury, even if the court's judgment on the evidence differs." Duke v. Uniroyal Inc., 928 F.2d 1413, 1417 (4th Cir.1991).
 
 
 51
 The prohibition on unfair and deceptive trade practices in North Carolina is embodied in N.C. Gen.Stat. § 75-1.1(a), which provides, in pertinent part, that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Therefore, for a plaintiff to prevail on an UTPA claim, he "must prove (1) that the defendant was engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or `had the capacity or tendency to deceive,' and (3) `that the plaintiff suffered actual injury as a proximate result of'" the defendant's actions. Gilbane, 80 F.3d at 902 (quoting Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 343 S.E.2d 174, 179-80 (1986)). In our Gilbane decision in 1996, Judge Ervin had occasion to interpret and apply the North Carolina UTPA, and he there observed that "[w]hat constitutes an unfair or deceptive trade practice is a somewhat nebulous concept," and that "North Carolina courts base their determinations [of whether a particular practice is unfair or deceptive] on the circumstances of each case." Id. Thus, whether a particular practice violates the UTPA is both a question of law and a highly fact-specific inquiry.
 
 
 52
 As Judge Ervin noted in Gilbane, in assessing whether particular conduct violates the UTPA, "[e]ither unfairness or deception can bring conduct within the purview of the statute; an act need not be both unfair and deceptive." Id. at 903 (citing Rucker v. Huffman, 99 N.C.App. 137, 392 S.E.2d 419, 421 (1990)). And while there is no doubt that the North Carolina courts have construed the UTPA liberally, there are some limits on its application. Id. For example, only practices that involve "[s]ome type of egregious or aggravating circumstances" are sufficient to violate the UTPA. Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 711 (2001).
 
 
 53
 As a general rule, a practice is considered "unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 403 (1981). The North Carolina Court of Appeals explained the applicable standard several years ago in Harrington Manufacturing Co. v. Powell Manufacturing Co., 38 N.C.App. 393, 248 S.E.2d 739 (1978), observing that an "unfair practice" under the UTPA is conduct
 
 
 54
 which a court of equity would consider unfair. Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others.
 
 
 55
 Id. at 744 (emphasis added) (quotation and citation omitted). Significantly, the Supreme Court of North Carolina has held that "where a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice." Gray, 529 S.E.2d at 681. A particular practice is to be deemed deceptive, and in violation of the UTPA, if it has "the capacity or tendency to deceive." Marshall, 276 S.E.2d at 403. Thus, only the potential for deception is necessary; "proof of actual deception is not required." Id.
 
 
 56
 It is clear, however, that conduct carried out pursuant to contractual relations rarely violates the UTPA. In fact, even an intentional breach of contract is normally insufficient to contravene the UTPA; a breach of contract must be particularly egregious to permit recovery under North Carolina's UTPA. Canady v. Crestar Mortgage Corp., 109 F.3d 969, 975 (4th Cir.1997); Branch Banking & Trust Co. v. Thompson, 107 N.C.App. 53, 418 S.E.2d 694, 700 (N.C.Ct.App.1992).
 
 B.
 
 57
 We now turn to the contentions of SALT and the Stroud Group that the court erred when it concluded that they had committed unfair trade practices in violation of the UTPA. By its verdict, the jury found that SALT and the Stroud Group had engaged in three specific acts that formed the bases for an UTPA violation: (1) Simpson (a member of the Stroud Group) deliberately withheld information from Gibraltar concerning the inadequacy of Today's Contractors as the framing subcontractor on the Project; (2) SALT terminated Gibraltar as general contractor without the requisite architect's certificate showing that construction of the Project failed to conform with specifications, and when independent inspections had found no significant construction problems; and (3) the Stroud Group removed the Riese Group from SALT without any formal meeting, vote, documentation, or opportunity to be heard, and it failed to compensate the Riese Group for its partnership interest in SALT.[20] In its post-trial Opinion of March 10, 1999, the district court concluded that the jury's second finding was insufficient to violate North Carolina's UTPA, but it decided that the first and third incidents were legally sufficient to constitute unfair and deceptive trade practices in North Carolina. Opinion at 21-23. On appeal, SALT and the Stroud Group maintain that these two jury findings, i.e., the first and third findings, fail to pass muster under North Carolina law, and they seek reversal of the district court's ruling. We review their contentions on these issues in turn.[21]
 
 1.
 
 58
 The jury found that Simpson, a member of the Stroud Group, deliberately withheld information from Gibraltar concerning the inadequacy of the Project's first framing subcontractor, Today's Contractors. Under the evidence, Simpson had investigated Today's Contractors while working on earlier projects, and he knew, when Gibraltar retained Today's Contractors, of its reputation for poor workmanship. After evaluating this evidence, the jury found that Simpson had deliberately decided against revealing his knowledge of Today's Contractors to Gibraltar. SALT and the Stroud Group, however, maintain on appeal that any failure by Simpson to disclose his knowledge of the poor reputation of Today's Contractors cannot constitute an unfair or deceptive trade practice under North Carolina law, for two reasons.
 
 
 59
 First, they contend that there is no evidence that Gibraltar suffered any injury as a proximate result of Simpson's non-disclosure. They observe that the Construction Contract was a "cost plus" contract, meaning that SALT was obligated to pay Gibraltar for all construction costs relating to the Lexington Project, with no guaranteed maximum. As such, SALT and the Stroud Group assert that any construction costs incurred by Gibraltar as a result of the poor workmanship of Today's Contractors were passed on to SALT, and therefore Gibraltar suffered no damage. The jury, however, did not specify which conduct caused Gibraltar and the Riese Group's damages, and the evidence suggested that inadequacies in the framing subcontractor's work significantly impaired Gibraltar's ability to properly complete the Construction Contract. Because Gibraltar suffered adversely from its failure to fulfill its obligations under the Construction Contract, SALT and the Stroud Group's contentions on this point are not valid.
 
 
 60
 Second, SALT and the Stroud Group contend that Simpson's non-disclosure of Today's Contractors's reputation for poor work was insufficiently egregious to constitute an unfair or deceptive trade practice in North Carolina. They point out, in support of this contention, that the jury found that Simpson had no legal obligation to tell Gibraltar about Today's Contractors, and they also assert that Simpson's silence did not suggest his approval of Gibraltar's employment of Today's Contractors as the framing subcontractor. North Carolina courts have found that a failure to disclose relevant information can constitute a deceptive trade practice, if such failure to disclose is tantamount to a misrepresentation. Kron Med. Corp. v. Collier Cobb & Assocs., 107 N.C.App. 331, 420 S.E.2d 192, 196 (1992). As SALT and the Stroud Group observe, however, it is problematic to conclude that Simpson's non-disclosure of the poor reputation of Today's Contractors constituted such a misrepresentation, because there is no evidence that Simpson conveyed, or was expected to convey, information about Today's Contractors to Gibraltar. As such, Simpson's silence did not, in and of itself, constitute a misrepresentation; rather, Simpson simply made no representation at all to Gibraltar.
 
 
 61
 That fact, however, i.e., that Simpson made no representation of any sort, is precisely why his conduct was "unethical, unscrupulous and directly injurious to consumers," and is why it violated North Carolina's UTPA. Opinion at 22. As the Supreme Court of North Carolina has observed, the obligations imposed by the UTPA "create a cause of action broader than traditional common law actions." Marshall, 276 S.E.2d at 402. Thus, the mere fact that Simpson did not breach his contractual obligations does not, standing alone, mean that he did not commit an unfair trade practice. In this case, the jury determined that Simpson knew that Gibraltar was employing Today's Contractors, and yet, in the face of such knowledge, he deliberately withheld information from Gibraltar on its poor reputation and deficient earlier work. For a company to know that its general contractor was about to employ a substandard and shoddy subcontractor, and nevertheless deliberately withhold such information from the general contractor, is the essence of unscrupulous behavior. As such, we see Simpson's non-disclosure of Today's Contractors's poor reputation and deficient past performance as sufficiently egregious to constitute an unfair trade practice under the North Carolina UTPA.
 
 2.
 
 62
 The jury also found that the Stroud Group wrongfully removed the Riese Group from SALT without any formal meeting, without a vote, without documentation, without an opportunity for the Riese Group to be present or heard, and without paying the Riese Group anything for its twenty-five percent interest in the SALT Partnership. In this regard, the Stroud Group informed the Riese Group by letter, on May 14, 1996, that it was being expelled from the SALT Partnership, effective May 31, 1996. No prior meetings were held, and the Riese Group was not given an opportunity to persuade the Stroud Group to allow it to remain in SALT. Indeed the Riese Group was not even given notice that it faced expulsion. Most significantly, the Riese Group was not provided with any compensation for its twenty-five percent partnership interest in SALT, with the Stroud Group asserting that the Riese Group's partnership interest had no value as of May 31, 1996. The evidence, however, when reviewed in the light most favorable to the Riese Group, is devastating to the Stroud Group's position on this issue. Only eleven days after the Riese Group's expulsion from the partnership, SALT sold the Lexington Project to Prudential for a profit of approximately $1,200,000. The value of a twenty-five percent interest in SALT at that time was nearly $300,000.
 
 
 63
 The Stroud Group maintains, of course, that these actions are insufficient to violate the UTPA. It asserts that the SALT Partnership Agreement does not provide for any notice to the Riese Group other than the termination letter, that the Agreement does not require a hearing or any opportunity to be heard, and also that the Agreement specifies that expelled partners are entitled to only the "book value" of their partnership interest on the "date of expulsion." Thus, the Stroud Group contends that its expulsion of the Riese Group from SALT simply represented the exercise of a contractual right under the Partnership Agreement, and, relying on the decision of the North Carolina Court of Appeals in Tar Heel Industries, Inc. v. E.I. duPont de Nemours & Co., 91 N.C.App. 51, 370 S.E.2d 449 (1988), it maintains that the exercise of a contractual right cannot constitute an unfair trade practice.
 
 
 64
 The Stroud Group's reliance on the Tar Heel Industries decision for this proposition, however, is erroneous. In Tar Heel Industries, the North Carolina Court of Appeals held that duPont did not commit an unfair trade practice when it terminated its contract with Tar Heel. 370 S.E.2d at 451-52. Tar Heel had handled intrastate shipping of yarn and staple fiber among duPont's North Carolina warehouses. After a time, duPont decided to seek alternative shipping arrangements, and it eventually switched its shipping to one of its own subsidiaries. Because duPont was its only customer, Tar Heel ceased operations. Tar Heel then brought suit against duPont, alleging that it had violated the UTPA by not informing Tar Heel it was searching for another carrier. The Court of Appeals ruled for duPont, concluding that its actions in searching for alternative carriers and terminating its contract with Tar Heel were not unfair or deceptive trade practices. Id.
 
 
 65
 The Stroud Group asserts that the Tar Heel Industries decision demonstrates that exercise of a contractual right cannot violate the UTPA. That decision established no such exception, however, and it is distinguishable from this case on its facts. The Court of Appeals there engaged in a fact-specific inquiry and, in part because duPont was exercising a contractual right, concluded that it had not committed an unfair or deceptive trade practice. Id. There is nothing in the Tar Heel Industries decision holding that the exercise of a contractual right is necessarily outside the bounds of a general UTPA analysis. An unfair trade practice is an act which constitutes an "inequitable assertion of power or position." Gray, 529 S.E.2d at 681. Although it may be rare that the exercise of a contractual right will meet this stringent standard, it is possible for such an exercise, when it involves egregious and aggravating conduct, to constitute an unfair or deceptive trade practice under North Carolina's UTPA.[22] We must therefore consider whether, viewing the evidence here in the light most favorable to the Riese Group, its expulsion from SALT constitutes such a situation.
 
 
 66
 First of all, under Tar Heel Industries, the manner in which the Riese Group was expelled from SALT is, standing alone, insufficient to violate the UTPA. The Riese Group was aware of the provisions of the Partnership Agreement, and it knew that its interest in SALT could be terminated without notice and without the opportunity for a hearing. As such, like Tar Heel, the Riese Group had the opportunity to arrange its financial affairs to account for the nature of its business relationship under the Partnership Agreement. The fact that the Riese Group, as a result of the timing of its expulsion, was deprived of compensation for its one fourth interest in the SALT Partnership is, however, more problematic. Pursuant to both the Partnership Agreement and the Construction Contract, the Riese Group was not to be paid directly for its work on the Project. The only source of its compensation for such work was to be the profit it derived from SALT's sale or lease of the Project. Thus, by expelling the Riese Group before the sale of the Project to Prudential, SALT and the Stroud Group ensured that it received no compensation for its two years of work on the Project. In essence, therefore, the Riese Group asserts that SALT and the Stroud Group manipulated and exploited the provisions of the Partnership Agreement so that it received nothing for its labor.
 
 
 67
 Admittedly, the SALT Partnership Agreement makes clear that an expelled partner is to receive only the "book value" of his partnership interest. In that regard, the Riese Group agreed to a contract provision that allowed it to be expelled from SALT at any time and to receive only book value at the time of expulsion for its partnership interest. The presence of the expulsion provision, however, does not end our inquiry. As the North Carolina Court of Appeals has observed, whether a practice is unfair must be determined by whether "a court of equity would consider [it] unfair." Harrington Mfg. Co., 248 S.E.2d at 744. The fact that the Riese Group agreed to the expulsion provision is only one of the factors for consideration in determining whether its expulsion from SALT without compensation was an "inequitable assertion" of power. Gray, 529 S.E.2d at 681.
 
 
 68
 Taking all the foregoing into account, equity nevertheless compels the conclusion that the expulsion of the Riese Group from SALT in these circumstances constituted an unfair trade practice. As we have observed, we are reviewing a jury verdict, and we are obligated to view the evidence in the light most favorable to the prevailing party, i.e., the Riese Group. Duke, 928 F.2d at 1417. Taken in that light, the evidence demonstrates that the Riese Group had worked on the Project for over two years without being paid for its efforts. Although it was aware of the expulsion provision of the Partnership Agreement, it operated with the understanding that its compensation would derive from its share of any profit from the sale or lease of the Project. Moreover, from early 1995 onward, SALT was engaged in negotiations to sell the Project to Prudential. Thus, the Riese Group's continued commitment to the Project, without compensation, was secured by the very real possibility that the Project would be sold at a profit. Eleven days before it realized that profit, however, SALT and the Stroud Group manipulated the timing of its expulsion such that Riese Group received nothing for its efforts.[23]
 
 
 69
 Therefore, viewing the evidence in the light most favorable to the Riese Group, the Stroud Group exploited its rights under the Partnership Agreement to gain the full value of the Riese Group's labor without compensating it at all. Such manipulations and assertions of controlling influence are precisely the kind of "inequitable assertion[s]" of power that North Carolina deems to be unfair trade practices. Therefore, SALT and the Stroud Group's exploitation of its rights under the Partnership Agreement is sufficiently egregious to constitute a violation of the UTPA.
 
 3.
 
 70
 Thus, we conclude that SALT and the Stroud Group committed two unfair trade practices against the Riese Group and Gibraltar under North Carolina law: (1) in deliberately withholding from Gibraltar relevant and material information about the inadequacy of Today's Contractors as a framing subcontractor, and (2) in expelling the Riese Group from SALT without compensating it for its one-fourth partnership interest. As such, the district court's award of treble damages to the Riese Group, in the aggregate sum of $900,000, pursuant to the requirements of the UTPA, must be upheld.
 
 C.
 
 71
 On the other side of the ledger, the jury also found that the Riese Group and Gibraltar had committed three acts against SALT that formed the bases for findings of unfair and deceptive trade practices. Specifically, the jury found that: (1) the Riese Group and Gibraltar sought to mislead SALT concerning the status of construction of the Lexington Project, the expected date of completion, and/or the quality of construction; (2) the Riese Group and Gibraltar sought to mislead SALT by obtaining funds to pay subcontractors and material suppliers and then not paying them; and (3) the Riese Group and Gibraltar wrongfully concealed monies it paid to Universal Benefits (a payroll company owned by one of the Riese Group's employees) for payroll processing or leasing employees.[24] The district court, in its Opinion of March 10, 1999, found that each of these three acts constituted an unfair or deceptive trade practice under North Carolina's UTPA. Opinion at 8-9. These jury findings, and the judgment entered pursuant to them, have been appealed to us by the Riese Group and Gibraltar.
 
 1.
 
 72
 On appeal, the Riese Group and Gibraltar challenge the validity of the jury's findings in this connection. In support of their position, they repeat the contentions they made at trial, and they assert that no rational jury could have concluded that they either misled SALT on the status and quality of construction on the Project or misled SALT with respect to the subcontracting payments. As we have pointed out, however, we must review the evidence supporting the jury's factual findings in the light most favorable to the prevailing party, i.e., SALT and the Stroud Group. Duke, 928 F.2d at 1417. In conducting such a review, we see that SALT and the Stroud Group proffered ample trial evidence in support of these jury findings, such as testimony from construction experts, memoranda of the Riese Group, and financial records of the Project, as well as testimony from the members of the Stroud Group. A reasonable jury could well have found SALT and the Stroud Group's evidence to be persuasive, and the jury's findings are thus properly supported by the evidence. Therefore, we cannot disturb them.
 
 2.
 
 73
 Each of the three acts found by the jury also clearly rises to the level of an unfair or deceptive trade practice under the North Carolina UTPA. As a rule, misrepresentations, even negligent misrepresentations, are sufficient for an act to qualify as an unfair or deceptive trade practice. Gilbane, 80 F.3d at 903. Each of the challenged jury findings involves a situation in which the Riese Group and Gibraltar performed acts that, as the district court observed, "clearly had the capacity to deceive SALT as to the manner and completion of the parties' agreement." Opinion at 9. In addition, the use of construction funds for private purposes constitutes the "egregious or aggravating circumstances" necessary to sustain an UTPA violation. Dalton, 548 S.E.2d at 711. As such, the Riese Group and Gibraltar committed unfair and deceptive trade practices within the meaning of the UTPA, and the court's award of treble damages to SALT and the Stroud Group, in the aggregate sum of $450,000, was appropriate.
 
 V.
 
 74
 For the foregoing reasons, we affirm the judgment of the district court in all respects.
 
 
 75
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 The general contractor for the Lexington Project actually was Gibraltar Companies of Tennessee, Incorporated, a separate affiliated corporation formed and owned by the Riese Group specifically for the Nashville real estate development projects. As the Riese Group notes, the distinction between the two Gibraltar companies, for the purposes of these appeals, is not material, and we therefore refer to the Gibraltar corporations collectively and individually as "Gibraltar."
 
 
 [2]
 The several members of the Stroud Group and the Riese Group brought suit in their various individual capacities, as well as in connection with their involvement in various corporate and partnership business entities. Thus the parties to this litigation consist of the various individuals in the Stroud Group and in the Riese Group, as well as SALT and Gibraltar, and certain other Stroud Group-owned corporate entities
 
 
 [3]
 The SALT Partnership was initially owned by two other corporate entities controlled by the Stroud Group. The South Atlantic Management Company owned one percent of SALT and served as its general partner, while South Atlantic Income Properties, L.L.C., initially owned ninety-nine percent of SALT as a limited partner. When the Riese Group was brought into the SALT Partnership, it received a twenty-five percent ownership stake, and the ownership share of South Atlantic Income Properties was reduced to seventy-four percent
 
 
 [4]
 Under the SALT Partnership Agreement, the actual date of expulsion had to be specified in the notice of expulsion, and it was to be "the last day of a month not later than sixty (60) days after such notice is given."
 
 
 [5]
 Although in May 1994 the two Groups were only working on the Lexington Project, they contemplated involvement in at least one additional development in the Nashville area. As such, the Memorandum of Agreement is a general document which establishes the responsibilities of each Group with respect to any development projects in that geographic area
 
 
 [6]
 "Soft construction costs" are the costs of a development project that are not directly related to the actual construction, e.g., legal fees, architect's fees, or interest payments on loans
 
 
 [7]
 Included in the actual cost of construction, however, was Gibraltar's fee, i.e., three percent of the hard construction costs, for supervising construction of the Lexington Project
 
 
 [8]
 Because SALT was negotiating the construction loan with First Union at the same time Gibraltar was generating the control package for the Project, SALT accidentally obtained a loan that was $10,000 less than the estimated cost of the Project. Stroud testified at trial, however, that he did not want to go back to First Union to obtain additional funds and therefore SALT and Gibraltar "agreed to work with that amount of money."
 
 
 [9]
 A framing subcontractor is responsible for installing the frames, i.e., the skeletal structures designed to shape and support buildings
 
 
 [10]
 Although Gibraltar technically resigned as general contractor, it did so under duress. As a practical matter, had it not resigned it would have been terminated
 
 
 [11]
 The named plaintiffs in the initial lawsuit were the SALT Partnership, its general partner South Atlantic Management Company, and its limited partner South Atlantic Income Properties. Because no activity related to this litigation involves either of the latter two plaintiffs, we refer to the three plaintiffs collectively as SALT or as the SALT Partnership
 
 
 [12]
 The district court viewed the litigation as exceedingly complex, and remarked to counsel at the close of argument that it "was one of the most complex cases I've run into now in more than a decade on the bench."
 
 
 [13]
 Once the court has established that an act constitutes a violation of the UTPA, it must automatically treble the damages. N.C. Gen. Stat. § 75-16 (2001);see also Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 402 (1981).
 
 
 [14]
 The district court also granted SALT's motion for costs and awarded it $28,764.94. Opinion at 9-10. Thus, SALT's total award was actually in the sum of $1,578,765.94Id. at 25, 276 S.E.2d 397.
 
 
 [15]
 Obviously, we apply federal law in our consideration of SALT's challenge to the RICO jury instruction. With respect to the various supplemental state law claims, we apply the substantive law of the state under which the claims were filed, i.e., North CarolinaUnited Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 
 [16]
 Subsection (c) of the civil RICO statute provides, in pertinent part, that:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate ... commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity [.]
 
 
 [17]
 The mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do ... knowingly causes to be delivered by mail ..., any such matter or thing, shall be fined ... or imprisoned... or both.
 Similarly, the wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication... any ... signals ... or sounds for the purpose of executing such scheme or artifice, shall be fined ... or imprisoned... or both.
 
 
 [18]
 The district court gave the jury the following instruction on mail fraud:
 In order to establish mail fraud, [SALT] must prove each of the following by a preponderance of the evidence as to each defendant [i.e., the members of the Riese Group] charged:
 First: the defendant wilfully and knowingly devised a scheme or artifice to defraud, or for obtaining money or property by means of false pretenses, representations, or promises;
 Second: the defendant did so with an intent to defraud;
 Third: it was reasonably foreseeable that the mails would be used; and
 Fourth: the mails were in fact used in furtherance of some essential step in the scheme.
 
 
 [19]
 The court's instruction on wire fraud was identical to its instruction on mail fraud with respect to the first two elements. Instead of the third and fourth elements, however, it concluded with the following:
 Third: in advancing, or furthering the scheme to defraud, the defendant transmitted, or caused to be transmitted, a writing, signal, or sound from one state to another by means of telephone or telegraph lines or by means of radio or television.
 
 
 [20]
 More specifically, the jury answered "yes" to the following three special interrogatories:
 FIRST: Do you unanimously agree that [SALT or the Stroud Group] engaged in any of the following alleged acts of unfair and deceptive trade practices. Did [SALT or the Stroud Group] wrongfully:
 . . .
 b. Deliberately withhold information from [Gibraltar] concerning inadequacies of framing subcontractor? YES
 . . .
 e. Terminate Gibraltar without the requisite architect's certificate at a time when the independent construction inspectors had found no significant construction problems and when [SALT] shortly thereafter proffered an architect's certificate certifying that construction was in conformance? YES
 f. Remove [the members of the Riese Group] from [SALT] as limited partners without any formal meeting, vote, documentation, or opportunity to be present or heard and not paying them for their partnership interests? YES
 
 
 [21]
 Because the district court concluded that the jury's finding that SALT's termination of Gibraltar without an architect's certificate was not a violation of the UTPA, SALT is the prevailing party on that issue and could not appeal it. We do not further address this finding
 
 
 [22]
 As a practical matter, there will be few situations where the exercise of a contractual right will violate the UTPA. As we have noted, only "egregious or aggravating circumstances" will contravene the statuteDalton, 548 S.E.2d at 711. Because the parties to a contract have consented to its terms and are able to structure their business affairs accordingly, it will be rare for egregious and aggravating circumstances to attend the exercise of a contractual right.
 
 
 [23]
 In fact, an examination of the expulsion provision of the Partnership Agreement reveals that the Stroud Group had the option of expelling the Riese Group on either May 31, 1996, or June 30, 1996. The Partnership Agreement provides that the notice of expulsion must specify an actual date of expulsion that is "the last day of a month no later than sixty (60) days after such notice is given." In this case, the notice of expulsion was given on May 14, 1996; thus, either May 31 or June 30 were eligible dates for actual expulsion. Put simply, the Stroud Group had a choice of how to exercise its rights under the Partnership Agreement, and it chose to do so in the manner that ensured that the Riese Group would not be compensated for its work on the Project
 
 
 [24]
 The jury answered "yes" to the following three special interrogatories:
 FIRST: Do you unanimously agree that [Gibraltar and the Riese Group] engaged in any of the following alleged acts of unfair and deceptive trade practices. Did [Gibraltar and the Riese Group]:
 ...
 d. Seek to mislead [SALT] concerning the status of construction of the Lexington Apartments as to the financial status, expected date of completion, and/or quality of construction? YES
 ...
 g. Seek to mislead [SALT] by obtaining funds to pay subcontractors and material suppliers and then not paying them? YES
 h. Wrongfully concealed from [SALT] the charges paid to Universal Benefits for payroll processing or leasing employees[?] YES
 
 
 
 76
 TRAXLER, Circuit Judge, concurring in part and dissenting in part.
 
 
 77
 I concur in all but sections IV(B)(1), (2), and (3) of the majority opinion. Because I do not believe the acts attributed to the Stroud Group constitute unfair trade practices under North Carolina law, I respectfully dissent on those issues.
 
 
 78
 In my judgment, the Stroud Group's exercise of its contractual right to expel the Riese Group from the SALT partnership does not amount to an unfair trade practice. The Riese Group does not contest the fact that the Stroud Group had a contractual right to expel them after their misdeeds, and, in fact, the jury found that the expulsion did not violate the partnership agreement. The Riese Group has not directed our attention to a single North Carolina case in which the court premised UTPA liability on the exercise of a contractual right, and the state courts have actually expressed serious reservations about doing so. Indeed, two months after the instant appeal was argued, the North Carolina Court of Appeals reiterated its reluctance to extend the UTPA to cover actions that are proper under a contract, stating that "[a] violation of [the UTPA] is unlikely to occur during the course of contractual performance, as these types of claims are best resolved by simply determining whether the parties properly fulfilled their contractual duties." Mitchell v. Linville, 557 S.E.2d 620, 624 (N.C.Ct.App. 2001); see also Wachovia Bank & Trust Co. v. Carrington Dev. Assocs., 119 N.C.App. 480, 459 S.E.2d 17, 21 (1995) (finding that Wachovia did not engage in an unfair trade practice because it "simply exercised its right under the loan agreement to withhold funds"); Tar Heel Indus., Inc. v. E.I. duPont de Nemours & Co., 91 N.C.App. 51, 370 S.E.2d 449, 452 (1988) (finding that duPont was not liable under the UTPA for merely "exercising its [contractual] right to terminate the contract").
 
 
 79
 The federal courts should be wary about extending state statutes into territories of state law previously untouched by those statutes, especially when a federal court is asked to extend a particular state statute to cover a particular set of circumstances and the state courts themselves have questioned the propriety of doing so. See Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir.1998) ("[A]s a federal court exercising concurrent jurisdiction over [an] important question of state law we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been willing to go."). Furthermore, because the state courts have also hesitated to apply the UTPA to protect those who otherwise had the opportunity and ability to protect themselves, this court should be all the more reluctant to extend the Act to cover a party's exercise of its contractual rights in a case like this one, where the contracts were the result of extended negotiations between two sophisticated business entities, each of which had an adequate opportunity to protect its own interests. See Hall v. T.L. Kemp Jewelry, Inc., 71 N.C.App. 101, 322 S.E.2d 7, 11 (1984) (refusing to impose UTPA liability on the defendant who was exercising its contract rights because the plaintiff "entered into a bargain which was freely negotiated over several days" and thus "had ample opportunity to look after his own interests before the sale became final"); Opsahl v. Pinehurst, Inc., 81 N.C.App. 56, 344 S.E.2d 68, 77 (1986) (refusing to impose UTPA liability on a land sales company that represented construction completion dates as firm when in fact they were not, given "the capacity of consumers to contract with reference thereto" and thus to adequately protect themselves).
 
 
 80
 Nor, in my judgment, does Simpson's failure to disclose information to the Riese Group about the inadequacy of Today's Contractors provide a sufficient basis upon which to impose UTPA liability. The Riese Group was the general contractor in the construction and development of the Lexington, and according to the Riese Group's brief, Riese and Plichta have a combined seventy years of experience in construction and development between them. It was perfectly reasonable for Simpson to defer to the general contractor's expertise and experience in selecting subcontractors.
 
 
 81
 Furthermore, the Riese Group does not contend that, in failing to disclose the information about Today's Contractors, Simpson was setting the Riese Group up to fail so that the Stroud Group could later opportunistically expel them from SALT and effectively cut them out of any profit on the project. In the absence of proof to support any such contention, it is difficult to see how Simpson's nondisclosure can be considered sufficiently egregious to support UTPA liability, especially in light of the "cost plus" nature of the contract. Because of that feature, Simpson, as a member of the Stroud Group, had a definite economic incentive to disclose his misgivings about Today's Contractors if those misgivings were sufficiently serious to cause him to second-guess the Riese Group's decision to award the company a subcontract. Proper framing was critical to the structural integrity of the Lexington, and therefore if the Stroud Group was forced to repair shoddy framing the total cost of the project was likely to increase significantly, ultimately reducing the Stroud Group's profit on the project. Thus, because the Stroud Group stood to lose a great deal in terms of substantially increased costs if the framing of the Lexington was substandard, it is difficult to draw a negative inference from Simpson's nondisclosure and this court should not do so.
 
 
 82
 For the forgoing reasons, I respectfully dissent from that portion of the court's opinion that affirms the district court's order imposing treble damages on the Stroud Group pursuant to the North Carolina UTPA. I fully concur in the rest of the opinion.