Affirmed by published opinion. Judge KING wrote the majority opinion, in which Judge WILKINSON joined. Judge NIEMEYER wrote a dissenting opinion.
KING, Circuit Judge.
National Union Fire Insurance Company of Pittsburgh, Incorporated (“National Union”), seeks appellate relief from the 2004 Judgment entered against it in the Western District of North Carolina, following a jury trial on claims made by its insureds, ABT Building Products Corporation and ABTco, Incorporated (collectively “ABT”).[1] The Judgment awarded ABT compensatory damages in the sum of $2.5 million for National Union’s breach of its duty to defend, declaratory relief on National Union’s indemnity obligations to ABT, treble damages under the North Carolina Unfair and Deceptive Trade Practices Act (the “UDTPA”) in the sum of $11.7 million, and attorneys’ fees of nearly $2 million under the UDTPA. On appeal, National Union makes the following contentions: (1) that the district court erred in failing to grant judgment as a matter of law on ABT’s claim that National Union had breached a duty to defend ABT; (2) that the court erred in failing to grant judgment as a matter of law on ABT’s claim that National Union was obliged to indemnify ABT; (3) that the court erred in failing to grant judgment as a matter of law on ABT’s claim that National Union had violated the UDTPA; and (4) that the court erred in awarding attorneys’ fees to ABT. As explained below, we reject each of these contentions and affirm.
I.
A.
On June 14, 2001, ABT initiated this civil action in the Western District of North Carolina, alleging in its Complaint five separate causes of action against its insurer, National Union. ABT’s claims centered on National Union’s conduct relating to a series of underlying product liability actions involving hardboard siding manufactured by ABT (the “underlying actions”).[2] First, ABT sought a declaration that National Union was obliged to indemnify it in connection with the underlying actions (the “Indemnification Claim”). Second, ABT sought damages for National Union’s alleged breach of its contractual obligations, under insurance policies it had issued to ABT, in failing to defend ABT in the underlying actions (the “Failure to Defend Claim”). Third, the Complaint sought damages for National Union’s alleged conduct in its handling of ABT’s claims for defense and indemnification, asserting that such conduct was willful, malicious, and in bad faith (the “Bad Faith Claim”). Fourth, ABT alleged that National Union, as a result of its willful, malicious, and bad faith conduct, was liable to ABT for punitive damages (the “Punitive Damages Claim”). Finally, the Complaint alleged that National Union’s conduct in its denial and handling of ABT’s *104 claims for defense and indemnification contravened the UDTPA (the “UDTPA Claim”). In conjunction with these claims, ABT sought declaratory relief on its Indemnification Claim; compensatory damages on its Failure to Defend Claim; compensatory and punitive damages on its Bad Faith and Punitive Damages Claims; and treble damages, plus attorneys’ fees and other relief, on its UDTPA Claim.
After nearly three years of extensive pre-trial proceedings, a jury trial was conducted by the district court in Statesville, North Carolina, in June of 2004. As explained below, the resulting verdict was in favor of ABT and gives rise to this appeal.
B.
The evidence presented by the parties in the nine-day jury trial consisted of the testimony of approximately sixteen witnesses plus an array of exhibits. In its evidentiary presentation, ABT emphasized two factual underpinnings of its claims against National Union: (1) that National Union had failed in bad faith to defend and indemnify ABT in connection with the underlying actions; and (2) that National Union had intentionally sold and issued to ABT a new liability insurance policy covering a two-year period for which ABT was already insured by National Union, and that the new policy narrowed ABT’s coverage and more than doubled its annual premium. The jury, after hearing and considering the trial evidence and instructions on the applicable legal principles, received and completed a Verdict Form of nearly four pages (the “Verdict”).[3] The Verdict resolved the disputes between the parties, largely in favor of ABT. The factual predicate of the Verdict, as drawn from the trial evidence, is summarized as follows.[4]
1.
ABT manufactures hardboard siding, a wood-based product that is sold and affixed to the exteriors of homes, at a plant it operates in western North Carolina. The plaintiffs in the underlying actions, which were filed beginning in 1995, had purchased and installed hardboard siding manufactured and sold by ABT. They alleged, inter alia, that the siding, when exposed to moisture, humidity, and other normal climatic conditions, absorbed moisture and prematurely rotted and deteriorated. Many of the plaintiffs also claimed that those problems had, in turn, resulted in consequential damages to other parts of their homes.
During the period from January 1, 1997, to January 31,1998, ABT was covered by a commercial general liability insurance policy issued by Employers Insurance of Wau-sau (the “1997 Wausau Policy”). The 1997 Wausau Policy was ABT’s primary liability insurance policy for the period of its coverage, and it provided coverage to ABT for defense and indemnity on liability claims made by purchasers of its products. The Policy contained a limit of $1 million per occurrence, obligated Wausau to defend ABT in connection with covered claims, and provided that the expenses Wausau incurred in the defense of any lawsuits or claims would be in addition to the $1 million per occurrence limit. Although several of the underlying actions were pending when the 1997 Wausau Policy was issued, *105 it did not exclude claims relating to defective siding manufactured by ABT.
During the coverage period of the 1997 Wausau Policy, ABT was also insured under a commercial general liability policy issued by National Union (the “1997 NU Policy”).[5] The 1997 NU Policy was an umbrella liability policy, requiring National Union to indemnify ABT for any liabilities in excess of the limits of ABT’s underlying insurance (such as the 1997 Wausau Policy), up to $25 million. Pursuant to the 1997 NU Policy, National Union was obliged to defend ABT against covered claims when ABT’s underlying insurance had “been exhausted by payment of claims.” 1997 NU Policy § II.A.1. Under the terms of the 1997 NU Policy, ABT agreed that, even if it failed to keep its underlying insurance in full force and effect for the coverage period of the Policy, National Union’s defense and indemnity obligations to ABT would be measured as if ABT’s underlying insurance had remained in effect (the “Underlying Insurance Clause”). See id. § VI.I. As relevant, the 1997 NU Policy covered “Property Damage ... caused by an Occurrence.” Id. § I.[6] It specifically excluded from coverage “Property Damage to Your Product arising out of it or any part of it” (the ‘Your Product Exclusion”). See id. § V.F.[7] And, like the 1997 Wausau Policy, the 1997 NU Policy did not exclude the coverage of claims against ABT relating to its manufacture of hardboard siding.
The 1997 NU Policy was initially issued for the thirteen-month period from January 1, 1997, to January 31, 1998. This coverage period was soon identified as erroneous, however, in that National Union and ABT had agreed that the Policy would cover a thirty-seven-month period. When ABT notified National Union of the coverage period error, the 1997 NU Policy’s “Endorsement # 012” was issued by National Union. That Endorsement, in conformity with the earlier agreement, extended the coverage period of the 1997 NU Policy for the proper thirty-seven-month period, through January 31, 2000.
On January 14, 1998, Wausau notified ABT that it planned to cancel ABT’s primary liability insurance coverage under the 1997 Wausau Policy, which was scheduled to expire seventeen days later, on January 31,1998. In order to comply with the applicable legal requirements for its cancellation decision, Wausau was obliged to provide ninety days’ notice to ABT. As a result, it issued a “stub,” or extension, policy that extended the terms of the 1997 Wausau Policy for the three-month period from January 31, 1998, to May 1, 1998 (the “1998 Wausau Stub Policy”). Wausau then issued a new primary liability policy to ABT — which excluded from coverage any and all claims arising from ABT’s manufacture and sale of hardboard siding — effective for the nine-month period from May 1, 1998, through January 31, 1999 (the “1998 Wausau Policy”).
*106 2.
In January 1998, National Union underwriter Paul Rovelli assumed responsibility for his company’s ABT account. Initially, Rovelli was unaware of National Union’s issuance of Endorsement # 012, which had extended the 1997 NU Policy’s coverage period from thirteen to thirty-seven months. Thus, in early 1998, under the mistaken belief that the 1997 NU Policy would expire after thirteen months (on January 31, 1998), Rovelli began the process of underwriting a new National Union policy to provide general liability coverage for ABT.
The sequence of events that followed Rovelli’s assumption of responsibility for the ABT account was revealed to the jury in an email that Rovelli had prepared and forwarded to his superiors at National Union on February 4, 1998 (the “Rovelli Email,” or the “Email”).[8] As he related therein, “after I requested renewal information, I noticed that buried within the policy were two endorsements, one giving it a multi-year term from 1/01/97 to [1/31/2000], and the other providing annual installments of $58,980.” Pl.’s Ex. 46. Rovelli was thus aware, early in his underwriting process, that there was no need to re-underwrite ABT’s umbrella liability coverage, since the 1997 NU Policy did not expire for another two years. He nonetheless continued the underwriting process, explaining in the Email that “I started to look into the file [and] noticed that there were class-actions outstanding.” Id. Although ABT had disclosed to National Union the existence of the underlying actions in its application for the 1997 NU Policy, Rovelli (in his efforts to re-underwrite ABT’s coverage) became concerned that National Union had substantially underestimated its exposure to defective siding claims.
Rovelli decided to investigate the matter further and, in so doing, contacted the insurance broker that had arranged the 1997 NU Policy (Marsh & McLennan, Inc.), requesting further financial information on ABT. Rovelli then “received and reviewed [ABT’s] annual report and noticed not only a reoccurrence of the class-actions but a significant change in exposure.” Pl.’s Ex. 46. Rovelli thus realized, when he composed the Email and sent it to his colleagues at National Union, that ABT would likely face additional defective siding claims in the remaining two coverage years of the 1997 NU Policy, and that there was, unfortunately for National Union, no “caveat in the policy” allowing National Union to avoid its defense and indemnification obligations on those claims. Id.
Importantly, Rovelli knew at the time he prepared and sent the Email that the 1997 NU Policy, even after Endorsement # 012 was issued, made it appear that its coverage period was only thirteen months and would expire on January 31, 1998. As he wrote to his superiors in the Email, “the *107 policy looked on the system and on the Declarations] page” as if it were “a one-year deal.” Pl.’s Ex. 46. The declarations page, in other words, had not been amended to reflect Endorsement # 012’s two-year extension of ABT’s coverage period under the 1997 NU Policy, and the Endorsement itself was, according to Rovelli, “buried within the policy.” Id.
When Rovelli conveyed the foregoing information to his superiors at National Union, they immediately grasped the potential magnitude of National Union’s defense and indemnity obligations to ABT under the 1997 NU Policy. One of those officials, Ken Gregnoli, a Vice President for the Excess Casualty Department at AIG (National Union’s parent company) testified that “it was obvious to me that the umbrella was going to be impacted by these hardboard siding claims.” J.A. 887. He recalled at trial that his conclusion at the time was that National Union was “going to pay substantially.” Id. at 887-88. Gregnoli further acknowledged in his trial testimony that, in his view, National Union would also have to pay “a significant amount of money into defending these type of claims.” Id. at 888-89.
Rovelli’s superiors shared his understanding that the 1997 NU Policy afforded National Union no means of avoiding its liability to ABT on the underlying actions. For example, John Schumacher, the President of AIG’s underwriting affiliate (American Home Assurance Company) and the highest-ranking official involved in the decision to sell ABT a redundant policy, testified at trial concerning that decision. When asked whether insurance companies were entitled to re-underwrite coverage in the middle of a multi-year policy period, Schumacher testified: “You know, I’ve seen insurance carriers try to cancel a policy, not often but occasionally, midterm, and they get sued. They get sued big time and generally lose.” J.A. 864. Schu-macher also testified that he left his position as President of American Home in part because some AIG officials had not been forthright with policyholders.
Ultimately, despite knowing that ABT was already covered under the 1997 NU Policy for hardboard siding claims through January 31, 2000, and that National Union could not cancel ABT’s coverage under the Policy at an earlier date, National Union decided, as Rovelli explained in the Email and reiterated in his trial testimony, to “under-wr[i]te anyway.” Pl.’s Ex. 46; J.A. 841. National Union thereafter required ABT to purchase an umbrella liability insurance policy for the twenty-four-month period from January 31, 1998, to January 31, 2000 (the “1998 NU Policy”). For this new policy — which provided overlapping coverage to ABT for the final two years of the 1997 NU Policy’s coverage period— National Union charged ABT a premium of $135,000 per year, more than double the annual premium it was already being charged for the 1997 NU Policy. More significantly, the 1998 NU Policy eliminated National Union’s duties to defend and indemnify ABT with respect to hardboard siding claims. And, despite requiring ABT to purchase the 1998 NU Policy, National Union left the 1997 NU Policy in effect.
3.
a.
In 1997, ABT and the plaintiffs in the underlying actions initiated settlement negotiations on the claims against ABT in those actions and with respect to other potential defective siding claims. These efforts intensified in 1999, and counsel for ABT and the plaintiffs agreed that a national class action pending in an Alabama state court (styled as Foster v. ABTco, Inc., in the Circuit Court of Choctaw County) was the appropriate vehicle by *108 which to resolve their disputes. During the course of these lengthy settlement negotiations, ABT kept Wausau, National Union, and its other insurers fully apprised of its efforts, and it provided its insurers with a series of draft settlement proposals that were developed in the negotiations process.[9]
In connection with these settlement negotiations, an analysis was conducted — at the request of ABT’s insurers — to assess the potential damages ABT faced in the underlying actions. The expert retained for that purpose, Dr. Michael Sullivan, estimated the total cost of the proposed settlement to be $41.6 million, and he presented his views to ABT and its insurers in the fall of 1999.[10] When those present asked Sullivan for an estimate of the likely consequential damages if the settlement negotiations failed and the underlying actions went to trial, Dr. Sullivan opined that such damages to manufactured homes alone would be $87.7 million.
Wausau initially disputed its contractual obligations, under the 1997 Wausau Policy and the 1998 Wausau Stub Policy, to defend and indemnify ABT in the underlying actions. On November 4, 1999, however, ABT and Wausau reached a settlement agreement (the “Wausau Settlement”) under which Wausau agreed to pay ABT the sum of $1.5 million “in compromise of disputed claims” (the ‘Wausau Settlement Payment”), and to continue to pay its share of defense costs through July 31, 1999. Wausau Settlement §§ III, IV.[11] Pursuant thereto, ABT agreed to pay Wausau’s share of defense costs incurred after July 31, 1999. Of the $1.5 million ABT received from Wausau under the Wausau Settlement, $1,147,058.83 was allocated to the 1997 Wausau Policy, and the remaining $352,941.17 was allocated to the 1998 Wausau Stub Policy. See id. § VI.
On September 21, 2000, the Alabama state court approved the settlement of the underlying actions in the Foster class action litigation (the “Foster Settlement”).[12] The Foster Settlement served as a global resolution of the underlying actions and barred any future claims against ABT by settlement class members who did not opt out. It released all claims against ABT in the underlying actions, including claims for consequential damages, in exchange for payments to be made by ABT through an agreed-upon claims program. This claims program, in which settlement class members may participate at any time within twenty-five years of the installation of defective siding, requires, inter alia, the submission of a claim to ABT, along with photographs sufficient to permit a determination of the square footage of a class member’s damaged siding. The Foster Settlement establishes a rate of compensation, which it terms “Replacement Cost,” that includes the costs of all materials, labor, and incidentals necessary to replace defective siding with new siding and to repair damage caused by the defective sid *109 ing. See Foster Settlement ¶ 1.48.[13] This comprehensive “Replacement Cost” is then multiplied by a second number called “Compensable Damage” (the square footage of damaged siding on a settlement class member’s home) to ascertain the appropriate damage payment. See id. ¶¶ 1.16,1.19.[14]
b.
At the time of the Foster Settlement, National Union had long believed that a settlement of the underlying actions would exhaust ABT’s underlying insurance coverage and trigger National Union’s defense and indemnity obligations under the 1997 NU Policy. Indeed, Aimee Tersy, the Director of Excess Casualty Claims for AIG Technical Services (National Union’s claims administrator), who was in charge of ABT’s claims against National Union during the Foster Settlement negotiations, testified at trial that “never paying was never a consideration. We knew there were damages out there.” J.A. 486.[15]
National Union was also aware throughout the Foster Settlement negotiations of ABT’s efforts to resolve the underlying actions using a single, comprehensive class settlement, an approach that promised to save ABT and its insurers a substantial amount of money. Ms. Tersy testified that she had attended a number of meetings on the proposed Foster Settlement, and that National Union understood ABT’s settlement strategy. According to her evidence, National Union recognized that the underlying actions must be settled, knew the form the settlement likely would take, and knew that ABT needed the participation of all its insurers in order for the settlement to succeed. After the Foster Settlement was entered into and approved by the Alabama court, however, and even though ABT’s other insurers agreed to participate therein, National Union ignored ABT’s requests for defense and indemnification under the 1997 NU Policy.
On November 17, 1999, ABT, seeking to resolve its dispute with National Union, made a settlement offer to National Union in the sum of $3 million, believing at the time that the 1997 NU Policy had expired on January 31, 1998. When ABT thereafter realized that the 1997 NU Policy was actually in effect until January 31, 2000, it made a revised settlement offer to National Union, on December 30, 1999, in the sum of $5 million. This proposal would have resolved National Union’s defense and indemnity obligations to ABT in connection with the underlying actions.
During the course of these events, National Union’s coverage counsel, Christo *110 pher Aries, advised National Union that a refusal to contribute to the Foster Settlement would be “leaving its insured to ‘twist in the wind’ and accordingly a Court would not give serious consideration to [an] attempt to claim that the settlement amount was unreasonable.” J.A.2042. Despite this explicit warning (made in confidence by Aries) that it could be exposing itself to claims of bad faith conduct against its insured, National Union did not respond to ABT’s settlement proposals, failed to contribute to ABT’s defense costs, and did not indemnify ABT against the underlying actions. Rather, National Union delayed resolution of ABT’s claims by repeatedly requesting information that ABT had already provided. Finally, on May 24, 2001, nearly seventeen months after ABT’s revised offer to settle with National Union for $5 million, National Union simply closed its file on ABT’s defense and indemnity claims relating to the underlying actions — without making a decision on its coverage obligations to ABT.
C.
On June 22, 2004, at the close of ABT’s case-in-chief, National Union unsuccessfully moved the trial court for judgment as a matter of law, pursuant to Rule 50(a), on each of ABT’s claims. Subsequently, on June 24, 2004, after all the evidence had been presented, National Union renewed its motion for judgment as a matter of law, and the court again denied the motion. On June 25, 2004, at the conclusion of the nine-day trial, the jury rendered its Verdict in the matter, finding as follows:
• That National Union had breached its duty to defend ABT in the underlying actions;
• That ABT was damaged by this breach in the sum of $2.5 million;
• That all of the damages alleged in the underlying actions resulted from a single “Occurrence,” i.e., alleged defects in the ABT-manufactured hardboard siding;
• That the 1997 NU Policy covered the Foster Settlement claims arising from “Property Damage” caused by defective siding installed during the period from January 1, 1997, through January 31, 2000;
• That 22.5% of each Foster Settlement payment represents the costs of replacement siding, and 77.5% of each such payment represents the costs of all other labor and materials;
• That National Union is responsible for administrative costs of $378.06 for each future claim made under the Foster Settlement;
• That National Union owed ABT $1,860,740 in settlement class counsel fees, notice costs, and claims administration fees already incurred;
• That National Union (in connection with the UDTPA Claim) had failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement with ABT when National Union’s liability to pay for part of the Foster Settlement became reasonably clear;
• That National Union (also in connection with the UDTPA Claim) had misrepresented the terms of the 1997 NU Policy for the purpose of changing National Union’s coverage obligations in 1998-2000, and that ABT had relied on that misrepresentation to its detriment;
• That ABT was damaged, in the sum of $3.9 million, by National Union’s conduct relating to the UDTPA Claim;
• That National Union’s conduct constituted bad faith, resulting in damages to ABT of $3.9 million; and
• That National Union’s bad faith conduct was accompanied by aggravated *111 conduct (such as malice, fraud, or oppression) that indicated a reckless indifference to the consequences thereof, and that ABT was entitled to recover $7.5 million in punitive damages.
See Verdict.[16]
On July 16, 2004, ABT filed a motion for judgment on the jury verdict, along with a proposed judgment and a memorandum in support thereof (the “ABT Judgment Memorandum”). On September 30, 2004, after National Union had submitted its opposition to the motion for judgment and ABT had filed a reply, the district court entered its Judgment against National Union.[17] The Judgment entitled ABT to recover from National Union $2.5 million on the Failure to Defend Claim, $11.7 million on the UDTPA Claim (trebled from the jury’s award of $3.9 million), and certain interest.[18] The Judgment also included declaratory relief provisions against National Union on the Indemnification Claim (the “Declaratory Provisions”), as follows:
• That ABT is entitled to indemnification from National Union for claims under the Foster Settlement that are attributable to installations of defective siding during the period from January 1, 1997, through January 31, 2000;
• That National Union’s obligation to indemnify ABT for future claims under the Foster Settlement will begin after ABT has paid $3 million in settlement costs or claims attributable to installations from January 1, 1997, through January 31, 2000;
• That, as of the date of the Verdict, ABT had paid Foster Settlement costs of $1,860,740 and claims of $275,598 (exclusive of the costs of siding);
• That National Union is obligated to indemnify ABT for 77.5% of each claim under the Foster Settlement that is attributable to installations of defective siding during the National Union coverage period; and
• That National Union is obligated to ABT for $378.06 for each applicable claim under the Foster Settlement, to cover the administrative costs of handling such claims.
See Judgment 6.
Of note, the Declaratory Provisions, consistent with ABT’s proposed judgment, did not require National Union to indemnify ABT for its first $3 million in Foster Settlement payments (the “$3 million declaration”). See Judgment 6. The ABT Judgment Memorandum explained ABT’s position on this point as follows: The $3 *112 million figure was the sum of ABT’s three successive underlying indemnity coverage limits during the 1997 NU Policy period. The 1997 Wausau Policy had a limit of $1 million per occurrence, which applied to that Policy’s coverage period of January 1, 1997, through January 31, 1998. The 1997 Wausau Policy also provided that, if it continued in effect beyond January 31, 1998, it would have a separate $1 million per occurrence limit for each succeeding twelve-month period. Wausau cancelled ABT’s coverage for hardboard siding losses in 1998, but because of the 1997 NU Policy’s Underlying Insurance Clause, National Union’s defense and indemnity coverage obligations are measured as if ABT’s hardboard siding coverage under the 1997 Wausau Policy continued throughout the 1997 NU Policy period. That is, a second $1 million limit applies for the period from January 31, 1998, through January 31, 1999, and a third $1 million limit for the period from January 31, 1999, through January 31, 2000. For purposes of the administrative implementation of the Judgment, ABT acknowledged that the aggregate of its underlying-indemnity coverage during the 1997 NU Policy coverage period was thus $3 million.[19] As a result, ABT proposed that National Union reimburse it only for the excess over $3 million of ABT’s Foster Settlement costs for the period of the 1997 NU Policy. The Judgment reflects this concession by ABT. See Judgment 6.
On October 6, 2004, National Union, in its post-trial motions, renewed its motion for judgment as a matter of law (pursuant to Rule 50(b)), and made separate motions for a new trial and to alter or amend the Judgment. The district court denied those motions by its Order of May 31, 2005 (the “First Order”).[20] Importantly, the court there ruled that National Union’s duty to defend was triggered by ABT’s exhaustion of the annual $1 million underlying limit in effect during the National Union coverage period (the “$1 million trigger ruling”). See First Order 7. In so ruling, the court rejected National Union’s position that the court had, by its earlier $3 million declaration, already decided that the 1997 NU Policy assigned National Union no defense obligations until ABT had exhausted all three of its successive annual $1 million underlying limits. By another Order entered October 6, 2004, the court exercised its discretion under the UDTPA to award attorneys’ fees to ABT in the full amount of its $1,997,161 request (the “Second Order”).[21]
National Union has appealed the adverse Judgment entered by the district court, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.
*113 II.
We review de novo a district court’s denial of a Rule 50 motion for judgment as a matter of law. Bryant v. Aiken Reg’l Med. Ctrs. Inc. 333 F.3d 536, 543 (4th Cir.2003). Pursuant to Rule 50, the issue for assessment on appeal is whether there was a legally sufficient evidentiary basis for a reasonable jury, viewing the evidence in the light most favorable to the prevailing party, to find for that party. Fed. R.Civ.P. 50(a); Bryant, 333 F.3d at 543. If reasonable minds could differ about the verdict, we are obliged to affirm. Bryant, 333 F.3d at 543. As with other legal rulings, we review de novo the conclusions of law on which a trial court’s denial of judgment as a matter of law is premised. See Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1233 (4th Cir.1996). And we are obliged to accord substantial deference to a district court’s interpretation of its own judgment. See Home Port Rentals, Inc. v. Ruben, 957 F.2d 126, 131 (4th Cir.1992).
We review de novo a trial court’s legal determinations with respect to a UDTPA claim. S. Atl. Ltd. P’ship of Tenn., L.P. v. Riese, 284 F.3d 518, 535 (4th Cir.2002). We review a jury’s factual findings on a UDTPA claim “in the light most favorable to the prevailing party, and ‘[i]f, with that evidence, a reasonable jury could return a verdict in favor of plaintiffs, [we] must defer to the judgment of the jury, even if [our] judgment on the evidence differs.’ ” Id. (quoting Duke v. Uniroyal Inc., 928 F.2d 1413, 1417 (4th Cir.1991)).
Finally, we review for abuse of discretion a district court’s award of attorneys’ fees under the UDTPA. See N.C. Gen. Stat. § 75-16.1 (“[T]he presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party, such attorney fee to be taxed as a part of the court costs and payable by the losing party .... ”); see also Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 108 n. 6 (4th Cir.1991); Blankenship v. Town & Country Ford, Inc., 174 N.C.App. 764, 622 S.E.2d 638, 643 (2005).
III.
In its appeal, National Union makes four basic contentions of error. First, National Union contends that the district court erred in failing to grant judgment as a matter of law on the Failure to Defend Claim. Second, National Union maintains that the court erred in failing to grant judgment as a matter of law on the Indemnification Claim. Third, National Union contends that the court erred in failing to grant judgment as a matter of law on the UDTPA Claim. And fourth, National Union asserts that the court erred in awarding attorneys’ fees to ABT.
A.
We first assess National Union’s contention that the district court erred in failing to grant its Rule 50(b) motion for judgment as a matter of law on the Failure to Defend Claim. National Union offers two independent bases for its position in this respect. First, it maintains that the district court erred, in its First Order, in making the $1 million trigger ruling. Second, it asserts that the Wausau Settlement Payment, which exhausted the 1997 Wau-sau Policy, was not a “payment of claims” within the meaning of the 1997 NU Policy, and thus triggered no duty to defend on the part of National Union. We address these assertions in turn.
1.
We first address National Union’s assertion that the district court erred in making its $1 million trigger ruling. Na *114 tional Union maintains that this ruling is inconsistent with the court’s $3 million declaration and therefore erroneous.[22] Although the $3 million declaration expressly relates only to National Union’s indemnification duty, it also constitutes, according to National Union, a ruling that ABT could claim no coverage (for indemnity or defense) under the 1997 NU Policy unless it exhausted all three of its successive $1 million annual underlying limits. As such, National Union contends, the $3 million declaration establishes that the $1.5 million Wausau Settlement Payment — exhausting only the first of ABT’s $1 million underlying limits — was legally insufficient to trigger National Union’s duty to defend. And if National Union’s duty to defend never arose, it could not have been breached. On that basis, National Union assigns as error the court’s denial of its Rule 50(b) motion on the Failure to Defend Claim.[23]
National Union’s only authority for its position on the $3 million declaration is the Declaratory Provisions themselves; National Union regards its reading thereof as self-evident. When National Union presented this position in its post-judgment Rule 50(b) motion, however, the district court rejected it.[24] The court explained that National Union had simply over-read the $3 million declaration, which “refers to indemnity payments and not to National Union’s defense obligation.” First Order 7. The court specified that “ABT needed to exhaust [only] $1,000,000.00 in underlying coverage before National Union’s duty to defend was triggered.” Id. (emphasis added).[25] National Union is thus rowing against a strong current on this point, because “[w]hen a district court’s decision is based on an interpretation of its own order, our *115 review” must be highly deferential. JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc., 359 F.3d 699, 705 (4th Cir.2004) (observing that “district courts are in the best position to interpret their own orders”); see also Home Port Rentals, Inc. v. Ruben, 957 F.2d 126, 131 (4th Cir.1992) (“It is peculiarly within the province of the district court ... to determine the meaning of its own order.”); Anderson v. Stephens, 875 F.2d 76, 80 n. 8 (4th Cir.1989) (“We are, of course, mindful of the inherent deference due a district court when it construes its own order.”). National Union has failed to explain how a position premised solely on its reading of the Judgment can, in the face of such a deferential standard of appellate review, survive the district court’s disavowal of that very position. In effect, National Union has now asked us to take the extraordinary step of rejecting the district court’s interpretation of its own Declaratory Provisions. Absent any reasoned basis for so doing, we must decline National Union’s invitation.[26]
2.
National Union next contends that the $1.5 million Wausau Settlement Payment does not constitute a “payment of claims” within the meaning of the 1997 NU Policy, which requires the exhaustion of ABT’s underlying coverage by “payment of claims” in order to trigger National Union’s duty to defend. 1997 NU Policy § II.A.1. Put succinctly, National Union’s position is that the term “payment of claims” should be narrowly construed, excluding all payments other than those made directly to third-party claimants against ABT to satisfy judgments or secure the release of claims. By the Wausau Settlement, Wausau did not make direct payments to third-party claimants, nor did the Settlement satisfy a judgment or secure the release of any claims against ABT. Rather, Wausau paid ABT in order for ABT to make future payments to third-party claimants, pursuant to the Foster Settlement, to resolve the underlying actions. In National Union’s view, Wausau’s settlement with ABT therefore was not a “payment of claims” under the 1997 NU Policy.
In North Carolina, the interpretation of an insurance policy provision is a question of law. See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 172 S.E.2d 518, 522 (1970). We thus review de novo the district court’s rejection of National Union’s proposed interpretation of the term “payment of claims,” applying North Carolina’s well-established standards for interpreting insurance policy provisions. Under North Carolina law, the primary goal in interpreting an insurance policy is to discern the intent of the parties at the time the policy was issued. Register v. White, 358 N.C. 691, 599 S.E.2d 549, 553 (2004). If *116 the terms of the policy are plain, unambiguous, and susceptible of only one reasonable interpretation, a court will enforce the contract according to its terms. Id. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts must be resolved against the insurer and in favor of the policyholder. Id.
Under the foregoing principles, the question that we must decide is whether the term “payment of claims,” as used in the 1997 NU Policy, clearly fails to exclude the payment of a claim made by an insured in anticipation of the insured’s own subsequent payments to third-party claimants, or, in the alternative, whether the term “payment of claims” is ambiguous on whether it excludes such payments. If either of those conditions is met, we are obliged to reject National Union’s proposed interpretation of “payment of claims.” Because the term “payment of claims” clearly does not exclude payments of the kind involved here, we are unable to accept National Union’s proffered interpretation.
As used in the 1997 NU Policy, the term “payment of claims” is a broad one, which does not restrict the recipient or timing of the payment in question. National Union, of course, could have sought a more restrictive formulation — such as “payment of claims to third parties” or “payment of judgments or settlement agreements enforceable by third parties” — but it did not do so. In this case, the Wausau Settlement Payment resolved a claim presented by ABT, Wausau’s insured, in anticipation of ABT’s own impending payment of claims made by plaintiffs in the underlying actions. Nothing in the term “payment of claims” indicates that National Union and ABT intended it to exclude such payments. And we are neither inclined nor empowered to rewrite the 1997 NU Policy to reflect terms that National Union now wishes it had obtained from ABT.
Notably, in sponsoring this narrow construction of “payment of claims,” National Union seeks to diminish its substantive obligations under the 1997 NU Policy by taking advantage of the form of the Foster Settlement. If ABT had settled the underlying actions individually, by making lump-sum payments to third-party claimants, National Union’s defense obligations to ABT would have been triggered as soon as Wausau’s payments to claimants with defective siding installed in 1997 reached $1 million. ABT instead pursued a single, comprehensive settlement of all the underlying actions. That approach promised to minimize the costs incurred by ABT and its insurers, including National Union, but also meant that the underlying actions would all be settled at once, so that no underlying insurance payments would be made to third-party claimants until the litigation was concluded and ABT no longer required a defense. Therefore, under National Union’s view that it had no defense duty until ABT’s underlying insurance had been exhausted by payment of claims to third parties, ABT’s choice to pursue a comprehensive settlement excused National Union from its contractual obligation to defend ABT.
Put more broadly, National Union, under its view of the term “payment of claims,” likely would never be called upon to defend an insured in a situation such as ABT’s, where its insured has opted to resolve multiple actions in a single settlement of all outstanding claims, thus obviating the need for any further defense. Even more striking, National Union’s view would mean that it could never be required to defend an insured faced with only a single lawsuit, no matter how large, since the insured’s underlying insurance would make no payments to the third-party *117 plaintiff (or plaintiffs) until the lawsuit had been resolved and the need for a defense had passed. National Union’s position effectively would assign it a defense duty that would arise in only one circumstance: when its insured has faced multiple actions, resolved enough of them to exhaust its underlying coverage, and continued to defend the rest.
In these circumstances, we reject the view that the parties to the 1997 NU Policy intended the simple term “payment of claims” to effect such a dramatic narrowing of National Union’s contractual obligations to defend ABT. Cf. W & J Rives, Inc. v. Kemper Ins. Group, 92 N.C.App. 313, 374 S.E.2d 430, 434 (1988) (rejecting excess insurer’s contention that its duty to defend arose only if primary insurance was exhausted through payment of judgment or settlement, because “then the duty to defend under this contract would arise only after [the insured’s] need for defense was past”). Because the Wausau Settlement Payment constituted a “payment of claims” under the 1997 NU Policy, the district court did not err in rejecting National Union’s motion for judgment as a matter of law in this regard.[27]
B.
National Union’s second appellate contention is that the district court erred in failing to rule, in connection with the Indemnification Claim, that payments made by ABT pursuant to the Foster Settlement were not for “Property Damage” caused by an “Occurrence,” and that such payments thus fall outside the scope of the 1997 NU Policy. Pursuant to the Declaratory Provisions, National Union is obligated to indemnify ABT for 77.5% of the Foster Settlement payments. In support of its contention on the Indemnification Claim, National Union makes two separate assertions. First, it maintains that payments under the Foster Settlement to class members are only for the costs of replacing the defective siding itself, and therefore, are not for “Property Damage” covered by the 1997 NU Policy. Second, National Union contends that the costs of replacing the defective siding, along with the consequential damages suffered by homes upon which the siding was affixed, are readily foreseeable results of ABT’s “shoddy workmanship,” and thus not caused by an “Occurrence” under the 1997 NU Policy. We assess in turn these two aspects of National Union’s contention on the Indemnification Claim.
1.
First, because the Foster Settlement provides for the computation of dam *118 age awards on the basis of what it terms the “Replacement Cost” of the defective siding, National Union contends that ABT is not covered for payments it makes under the Foster Settlement. Pursuant to the Foster Settlement, the term “Replacement Cost” includes the costs of all materials, labor, and incidentals necessary to remove defective siding, replace it with non-defective siding, and repair damage to the structure and walls of settlement class members’ homes. See Foster Settlement ¶ 1.48. This “Replacement Cost,” calculated under the formula established by the Foster Settlement, is then multiplied by a second number called “Compensable Damage” (the square footage of defective siding on a settlement class member’s home) to reach the appropriate damage payment. See id. ¶¶ 1.16,1.19.
For purposes of the Indemnification Claim, the term “Replacement Cost” as used in the Foster Settlement — and as treated by the district court, the jury, and ABT at trial — consists of two separate categories of costs. The first such category represents the costs of materials used to replace the defective siding itself (the “costs of replacement product”), and the second represents all other costs, including labor and materials, arising from the repair work on the damaged homes (the “the third-party property damages”). The third-party property damages category thus consists of consequential damages, including all costs of home repairs except those represented by the costs of replacement product.
We agree with National Union that the first category of costs, the costs of replacement product, does not constitute “Property Damage” under the 1997 NU Policy. As the Policy spells out, “Property Damage” is “[pjhysical injury to tangible property, including all resulting loss of use of that property ... or [ljoss of use of tangible property that is not physically injured.” 1997 NU Policy § IV.K. Importantly, the Your Product Exclusion of the 1997 NU Policy provides that “[tjhis insurance does not apply to ... Property Damage to Your Product arising out of it or any part of it.” Id. § V.F. Under North Carolina law, this language “excludes damages sought for the cost of repairing or replacing the insured’s own work or product.” W. World Ins. Co. v. Carrington, 90 N.C.App. 520, 369 S.E.2d 128, 130 (1988). Thus, the Your Product Exclusion excludes the costs of replacement product from coverage under the 1997 NU Policy.
Our conclusion on the foregoing point is not a subject of controversy in this appeal. The district court acknowledged that, by virtue of the Your Product Exclusion, National Union is not required to indemnify ABT for the costs of replacement product. ABT presented evidence that allocated payments under the Foster Settlement between the 22.5%, representing the costs of replacement product, and the 77.5%, representing the third-party property damages. Based on the jury’s finding that the costs of replacement product make up only 22.5% of the Foster Settlement payments and that the third-party property damages account for 77.5%, the Declaratory Provisions obligate National Union to indemnify ABT for 77.5% of each settled claim attributable to siding installed on homes during the National Union coverage period.
In challenging the Declaratory Provisions, National Union contends that, notwithstanding the jury finding to the contrary, the “Replacement Cost” component of the Foster Settlement formula is made up entirely of the costs of replacement product (excluded from coverage by the Your Product Exclusion), and does not include the third-party property damages (covered under the 1997 NU Policy as “Property Damage”). In other words, Na *119 tional Union asserts that the jury should have found that the costs of replacement product account for 100% — not just 22.5% — of the Foster Settlement payments.
Unfortunately for National Union, its position fails to account for the separate categories of damages encompassed by the term “Replacement Cost” (the costs of replacement product and the third-party property damages), and it is not supported by the record. ABT presented evidence at trial on how both categories of the Foster Settlement’s “Replacement Cost” were calculated. Phillip Waier, a professional engineer retained as a neutral advisor in connection with the Foster Settlement, prepared estimates for the costs of removal and replacement of the defective siding. According to Waier, the “Replacement Cost” component of the damage award formula includes not only the costs of replacement siding, but also the labor, materials, and incidentals related to those repairs. Waier also testified that, based on sales data provided by ABT, 22.5% of the “Replacement Cost” represents the costs of replacement product, while the other 77.5% represents the third-party property damages. The jury found Waier’s evidence compelling and allocated 22.5% of the “Replacement Cost” to the costs of replacement product, and the remaining 77.5% of the “Replacement Cost” to the third-party property damages.[28]
The district court conducted a post-trial independent review of these findings, and it concluded that they were “reasonable [and] supported by ample evidence.” First Order 13. The court thus concluded that National Union is obligated to indemnify ABT for the 77.5% of the “Replacement Cost” that the jury allocated to the third-party property damages, as such damages satisfy the definition of “Property Damage” under the 1997 NU Policy and North Carolina law. Because the evidence supports the jury’s findings, and because the court applied the appropriate legal principles in making its challenged ruling, *120 it did not err on the “Property Damage” aspect of the Indemnification Claim.[29]
2.
The second prong of National Union’s contention on the Indemnification Claim is that the damages claimed in the underlying actions did not arise from an “Occurrence” within the meaning of the 1997 NU Policy. Pursuant to the Policy, an “Occurrence” is “an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured.” 1997 NU Policy § IV.H. Although the Policy does not define the term “accident,” North Carolina law deems an accident to be “an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty.” Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 340 S.E.2d 374, 379 (1986) (internal quotation marks omitted). National Union contends that the district court erred in concluding that the damages claimed in the underlying actions resulted from an accident, because the consequences of ABT’s activity in manufacturing the defective siding were foreseeable. It asserts that the deterioration of the siding was not an accident under the 1997 NU Policy, but was instead the expected result of ABT’s “shoddy workmanship.”
In support of its contention that the Foster claims did not arise from an “Occurrence” within the meaning of the 1997 NU Policy, National Union relies on a 1999 North Carolina decision involving a construction contractor seeking insurance coverage for its faulty workmanship. See Wm. C. Vick Constr. Co. v. Pa. Nat’l Mut. Cas. Ins. Co., 52 F.Supp.2d 569 (E.D.N.C.1999). The court there held that poor workmanship does not, in and of itself, constitute a covered “occurrence.” See id. at 585. As ABT points out, however, the Vick decision has no applicability here, as it was not ABT’s workmanship that resulted in the damages complained of — indeed, ABT never performed any work on the Foster Settlement class members’ homes' — • it was instead ABT’s defective siding that resulted in the third-party property damages.[30]
Moreover, the Supreme Court of North Carolina has rejected the view that an act of negligence, like ABT’s manufacture of defective siding, cannot constitute an “accident” under a liability policy when the *121 resulting damage takes place without the insured’s actual foresight or expectation. See Iowa Mut. Ins. Co. v. Fred M. Simmons, Inc., 258 N.C. 69, 128 S.E.2d 19, 25-26 (1962). In Simmons, a declaratory judgment proceeding, the insurer contended that it had no duty to defend a suit against its insured, a roofing contractor, for damages caused by rain-water that had leaked into a building through a tarp thrown over an open roof, because rain was not unusual or unexpected. Id. The court concluded that the term “accident” in the liability policy did not necessarily exclude the contractor’s negligent conduct in leaving the roof insufficiently covered. See id. at 25. In so ruling, the court explained that “[t]o adopt the narrow view that the term ‘accident’ in liability policies of insurance ... necessarily excludes negligence would mean that in most, if not all, cases the insurer would be free of coverage and the policy would be rendered meaningless.” Id. In a post-Simmons decision, the North Carolina Court of Appeals observed that courts must look to “whether the damage was expected or intended” in determining whether an event constitutes an “occurrence.” Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 340 S.E.2d 374, 380 (1986). The court emphasized that “[wjhether events are ‘accidental’ and constitute an ‘occurrence’ depends on whether they were expected or intended from the point of view of the insured.” Id. (emphasis added). In other words, the issue is not whether an insured should have foreseen the consequences of its conduct, but whether it in fact foresaw or intended the resulting damages. See id.
Although National Union has not specifically addressed the Simmons decision, it remains good law in North Carolina. See N.C. Farm Bureau Mut. Ins. Co. v. Stox, 330 N.C. 697, 412 S.E.2d 318, 325 (1992) (holding, in light of Simmons, that when term “accident” is not defined in policy, even injuries caused by intentional acts can be accidental if injury was unintentional or not substantially certain to result from intentional act). In these circumstances, there is no evidence that ABT expected or intended the homes of the settlement class members to suffer damages from the defective siding. Accordingly, we must sustain the jury’s finding that the damages suffered by the class members’ homes were the result of an accident, and thus constituted an “Occurrence” under the 1997 NU Policy.[31] We therefore reject National Union’s contention that the court erred on the Indemnification Claim in failing to rule that payments made to settlement class members were not for property damage caused by an “Occurrence.”
C.
In its third contention of error, National Union maintains that the district court erred in failing to award judgment as a matter of law on ABT’s claim that National Union had violated the UDTPA. See N.C. Gen.Stat. §§ 75-1.1 to-39. The UDTPA *122 Claim arises from two separate aspects of National Union’s conduct: (1) its handling of the claims against ABT in connection with the underlying lawsuits and the Foster Settlement; and (2) its misrepresentations to ABT about the 1997 NU Policy’s coverage period in order to favorably alter its coverage obligations in the two-year period from January 1998 to January 2000. ABT contends that National Union acted in contravention of the UDTPA in its handling of ABT’s claim for indemnification by failing to settle its dispute with ABT. ABT asserts that National Union so acted even though it possessed all the information needed for a coverage determination and actually recognized internally that it had a duty to indemnify ABT for the underlying claims.
Put succinctly, the trial evidence was that ABT provided National Union with Dr. Sullivan’s report that consequential damages, i.e., the third-party property damages from the defective siding, would likely be $87.7 million if the case went to trial, and that National Union knew that ABT’s primary insurance coverage had been exhausted. National Union officials testified that they recognized, as early as 1998, that the 1997 NU Policy would be implicated in the defective siding claims, and they were warned by National Union’s own attorney that a failure to respond to ABT’s settlement demands could jeopardize the Foster Settlement and expose National Union to claims of bad faith. National Union nevertheless made no effort to respond to ABT’s settlement demands, and it closed its ABT file without ever responding. After National Union recognized that the 1997 NU Policy would be implicated, it induced ABT to purchase the 1998 NU Policy, at double the premium ABT was already obliged to pay, for the purpose of limiting National Union’s liability for the claims lodged against ABT, even though ABT was already covered by the 1997 NU Policy. Based on this evidence, the jury found that National Union had failed “to attempt in good faith to effectuate a prompt, fair and equitable settlement with [ABT] when National Union’s liability to pay for a part of the Foster claims became reasonably clear.” Verdict pt. B.l.c. The jury also found that National Union had induced ABT to negotiate and buy the 1998 NU Policy on terms less favorable to ABT than those of the 1997 NU Policy, and that ABT relied upon this misrepresentation to its detriment. Id. pt. B.l.a.
On appeal, National Union mounts a two-pronged attack on the Judgment entered on the UDTPA Claim. First, it contends that its liability never became reasonably clear, and thus its duty to attempt to effectuate a prompt, fair, and equitable settlement with ABT never arose. Second, National Union asserts that ABT could not, as a legal matter, have detrimentally relied on its misrepresentation that the 1997 NU Policy was for a term of only thirteen months.
1.
Before assessing these appellate contentions, it is important to briefly review the UDTPA and the applicable legal principles governing the UDTPA claim. In order to recover under the UDTPA, a party is obliged to show the following: “(1) that the defendant engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or ‘had the capacity or tendency to deceive,’ and (3) ‘that the plaintiff suffered actual injury as a proximate result of defendant’s deceptive statement or misrepresentation.’ ” Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 902 (4th Cir.1996) (quoting Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 343 S.E.2d 174, 180 (1986)). We have recognized that, under *123 North Carolina law, the conduct sufficient to constitute an unfair or deceptive trade practice “is a somewhat nebulous concept,” and depends on the circumstances of the particular case. Id. One thing is clear, however: “[0]nly practices that involve ‘[s]ome type of egregious or aggravating circumstances’ are sufficient to violate the U[D]TPA.” S. Atl. Ltd. P’ship of Tenn. v. Riese, 284 F.3d 518, 535 (4th Cir.2001) (quoting Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 711 (2001)). Generally, a trade practice will only be deemed “unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.” Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 403 (1981).
Of importance to a judicial assessment of whether a North Carolina insurer’s conduct was unfair or had the capacity or tendency to deceive is North Carolina’s Insurance Unfair Trade Practices Act (the “IUTPA”). See N.C. Gen. Stat. §§ 58-63-1 to -70. As relevant here, the IUTPA, which applies only to the insurance industry, precludes an insurer from, among other conduct, “[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” Id. § 58-63-15(11)®. The IUT-PA also bars an insurer from “[m]aking ... any ... statement misrepresenting the terms of any policy issued or to be issued ... for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance.” Id. § 58-63-15(1). Significantly, the Supreme Court of North Carolina has authorized trial courts to look to the IUTPA for examples of conduct that constitute unfair or deceptive acts or practices under the UDTPA. See Gray v. N.C. Ins. Underwriting Ass’n, 352 N.C. 61, 529 S.E.2d 676, 681-83 (2000). In North Carolina, a violation of section 58-63-15(11)® of the IUT-PA constitutes an unfair or deceptive trade practice under the UDTPA — as a matter of law — because such conduct is “inherently unfair, unscrupulous, immoral, and injurious to consumers.” Id. at 683. Of importance, the Supreme Court of North Carolina has held that a violation of section 58-63-15(1) of the IUTPA also constitutes a violation of the UDTPA. See Jefferson-Pilot Life Ins. Co. v. Spencer, 336 N.C. 49, 442 S.E.2d 316, 318 (1994).
Under the UDTPA, the “occurrence of the alleged conduct, damages, and proximate cause are fact questions for the jury.” S. Atl. Ltd. P’ship of Tenn., LP v. Riese, 284 F.3d 518, 534 (4th Cir.2002) (internal quotation marks omitted). On the other hand, “whether [such] conduct was unfair or deceptive is a legal issue for the court.” Id. Thus, when a jury has found a defendant to have committed infringing conduct, the trial court must then itself determine, as a legal matter, whether such conduct constituted an unfair or deceptive trade practice. Id.
Sections 58-63-15(11)® and -15(1) of the IUTPA are each implicated here, as the jury found that National Union had engaged in two specific acts forming the basis of the UDTPA Claim: (1) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement with ABT when its liability to pay under the 1997 NU Policy became reasonably clear; and (2) misrepresenting to ABT the terms of the 1997 NU Policy in order to favorably alter its coverage obligations for the two-year period from January 1998 to January 2000. Importantly, the district court concluded post-trial that there was “ample and compelling support in the record” for the jury’s finding that National Union had, by virtue of its violations of sections 58-63-11® and-15(l) of the IUTPA, violated *124 the UDTPA. First Order 9. On appeal, National Union attacks the jury’s findings in this regard, as well as the court’s conclusions, maintaining that the jury’s findings are “clearly erroneous,” and seeking reversal on the UDTPA Claim.
2.
National Union first challenges the jury’s finding, and the district court’s corresponding ruling, that National Union failed “to attempt in good faith to effectuate a prompt, fair and equitable settlement with [ABT] when National Union’s liability to pay for a part of the Foster claims became reasonably clear,” in contravention of section 58 — 63—15(f) of the IUTPA. Verdict pt. B.l.c. In support of this contention, National Union maintains that it never possessed a duty to indemnify ABT under the 1997 NU Policy, and thus was never obliged to attempt to effectuate a prompt, fair, and equitable settlement.
In pursuing this contention of error, National Union maintains that the district court’s post-trial ruling — that ABT was required to pay $3 million in claims under the Foster Settlement before National Union had a duty to indemnify ABT for additional payments under the Settlement— established that National Union’s duty to indemnify was never triggered, and National Union’s liability to ABT was thus never “reasonably clear.” See Judgment 6. In support of its contention that it could not have violated section 58 — 63—15(ll)(f) of the IUTPA because its duty to indemnify was never triggered, National Union points to various court decisions supporting the proposition that a UDTPA claim cannot succeed if the claimed losses are excluded from coverage. See, e.g., Rogers v. Unitrim Auto & Home Ins. Co., 388 F.Supp.2d 638, 643 (W.D.N.C.2005) (recognizing that when plaintiffs’ loss fell outside scope of coverage, plaintiffs could not succeed on UDTPA claim). The decisions on which National Union relies, however, involve situations readily distinguishable from the circumstances here. In this case, the district court did not conclude that the defective siding claims against ABT were excluded from coverage under the 1997 NU Policy. To the contrary, it ruled that the third-party property damages were covered by the Policy, and that National Union is obliged to indemnify ABT upon exhaustion of the underlying primary coverage limits.
We are thus faced with a somewhat unique situation, where it has been established that the insurer has a duty to indemnify that has not actually been triggered, but inevitably will be. Although National Union recognized early in the Foster Settlement negotiations that its duty to indemnify ABT would arise, it contends that its liability to ABT was never reasonably clear and that it had no duty under the IUTPA to seek to settle with its insured. In making this point, National Union urges us to equate reasonably clear liability with the triggering of an insurer’s duty to indemnify. Under the 1997 NU Policy, National Union agreed that it “will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law.” 1997 NU Policy § I. Thus, National Union relies on the proposition that its duty to indemnify ABT under the 1997 NU Policy arises when two events occur: (1) the underlying limits are exhausted; and (2) ABT becomes legally obligated to pay. If we were to accept National Union’s contention on this point — that it has no duty to attempt to effectuate a good faith settlement until its insured is legally obligated by a final judgment or settlement agreement — we would substantially undermine section 58-63-15(ll)(f) of the IUTPA, *125 which does not require a final judgment before an insurer has a duty to attempt to effectuate a settlement.
The issue for us to assess, therefore, is not whether National Union had a present duty to indemnify, but whether its “liability [had become] reasonably clear” under the IUTPA. N.C. Gen.Stat. § 58-63-15(ll)(f). National Union contends, in support of its decision not to settle with ABT, that ABT’s $5 million settlement demand was premised only on liability projections, and did not rely on any specified sums presently due. The trial evidence, however, which the jury and district court accepted, was that National Union’s liability was reasonably clear. Every primary and excess carrier of ABT — other than National Union — settled with ABT after receiving Dr. Sullivan’s report indicating that the third-party property damages from the defective siding would likely be about $87.7 million if the case went to trial. Ms. Tersy, the Director of Excess Casualty Claims for National Union’s claims administrator, acknowledged at trial that National Union had received Dr. Sullivan’s report containing the information that ABT’s other insurance carriers had relied on in making their settlement decisions, and she admitted that National Union had learned from Wausau that coverage under the 1997 Wausau Policy had been exhausted. The evidence also established that National Union’s officials were convinced (even before receiving Dr. Sullivan’s report) that the 1997 NU Policy would be implicated in the defective siding claims. Indeed, Vice President Gregnoli of AIG (National Union’s parent) testified that, as early as 1998, during the underwriting process for the 1998 NU Policy, National Union knew that the 1997 NU Policy was going to be implicated in the defective siding claims. Under the evidence, National Union’s realization that it was obliged to provide coverage to ABT pursuant to the 1997 NU Policy was the impetus for its scheme — by misrepresentations and fraudulent conduct — to secure ABT’s purchase of the 1998 NU Policy.
Notwithstanding the substantial trial evidence supporting National Union’s early recognition that it would be liable to ABT for indemnification on the defective siding claims, National Union failed to account for its utter lack of response to ABT’s settlement demands. National Union could have acted reasonably under the circumstances- — for example, it could have conducted an independent analysis of what the third-party property damages might be, or it could have advised ABT to wait for the actual costs of the claims in the underlying actions to be ascertained. National Union did neither — nor anything else — it instead simply closed its file on ABT without rendering a coverage decision. Viewed in the proper light, this evidence provides ample support for the jury’s finding that National Union’s indemnification liability was “reasonably clear” and that National Union nonetheless failed to attempt in good faith to effectuate a settlement with its insured.
In North Carolina, a violation of section 58 — 63—15(ll)(f) of the IUTPA constitutes an unfair or deceptive trade practice under the UDTPA, as a matter of law. Gray, 529 S.E.2d at 683. Because the evidence supports the jury’s finding that National Union engaged in conduct violating section 58-63-15(1l)(f) of the IUTPA, and because such a violation is “inherently unfair” and a violation of the UDTPA, the district court’s ruling that National Union violated the UDTPA was not erroneous.[32]
*126 3.
By its Verdict, the jury also found that National Union had violated the UDTPA by misrepresenting to ABT the terms of the 1997 NU Policy. More specifically, the jury found that National Union induced ABT to negotiate and buy the 1998 NU Policy on terms less favorable to ABT, and that ABT relied upon this misrepresentation to its detriment. Verdict pt. B.l.a. Such conduct contravened the IUTPA provision prohibiting insurers from “[mjaking ... any ... statement misrepresenting the terms of any policy issued or to be issued ... for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance.” N.C. Gen.Stat. § 58-63-15(1).
On appeal, National Union does not dispute the jury’s finding that it misrepresented to ABT the coverage period of the 1997 NU Policy. Nor does National Union dispute that the purpose of this misrepresentation was to induce ABT to purchase another policy at twice the premium for a period during which ABT was already covered, and to limit National Union’s liability for the defective siding claims. Instead, National Union asserts that, as a matter of law, ABT could not have detrimentally relied upon National Union’s misrepresentation, because ABT had already obtained Endorsement # 012, clarifying that the actual coverage period for the 1997 NU Policy was thirty-seven months. National Union therefore contends that ABT cannot establish National Union’s misrepresentation caused its injury.
As we have observed, under North Carolina law “what constitutes proximate cause between a deceptive act and a plaintiffs damages remains ambiguous.” Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 903 (4th Cir.1996). To be sure, however, proximate cause may be established by evidence of reliance, and here, the evidence readily supports a finding of reliance by ABT. See id.
First, the Rovelli Email, corroborated by Rovelli’s testimony, demonstrated that he knew, before underwriting the 1998 NU Policy, that the 1997 NU Policy extended coverage to ABT through January 31, 2000, and that there was no policy provision permitting National Union to cancel its coverage early. Nonetheless, National Union misrepresented to ABT that it had to buy the 1998 NU Policy, and ABT in fact purchased the Policy, paying double its annual premium for less coverage. It is nonsensical that ABT would have contemplated the purchase of another insurance policy, doubling its premium and narrowing its coverage, if it had known that it already had coverage under the 1997 NU Policy. And the jury found against National Union on this point, concluding that ABT relied on National Union’s misrepresentation that ABT had to purchase the 1998 NU Policy, and would not have done so in the absence of National Union’s misrepresentation. See Verdict pt. B.l.a. The involvement of ABT in procuring Endorsement # 012 thirteen months earlier *127 did not excuse National Union’s misrepresentation of coverage to ABT. National Union is not entitled to successfully assert, when ABT did as National Union requested, that ABT could not rely on National Union’s misrepresentation because it already knew of the falsehood. This is precisely the kind of conduct the IUTPA aims to deter. We thus agree with the district court that the evidence before the jury provided “ample and compelling support” for a finding of detrimental reliance. First Order 9.
Of course, an insurer has no duty under North Carolina law, in the absence of a request, to keep its insured apprised of the meaning and effect of all the provisions in its policy. See, e.g., Hardin v. Liverpool & London & Globe Ins. Co., 189 N.C. 423, 127 S.E. 353, 355 (1925) (“We cannot approve the position that, in the absence of a request, it was the agent’s legal duty to explain the meaning and effect of all the provisions in the policy.”). The circumstances here, however, are not that ABT had unvoiced misconceptions about the meaning of the provisions of the 1997 NU Policy that it expected National Union to first intuit, and then clarify for ABT. Instead, the evidence is that National Union engaged in a scheme to provide unsolicited, false information to ABT, for the specific purpose of inducing ABT to purchase insurance for a period for which National Union was already providing coverage to ABT, in order to minimize National Union’s liability for the defective siding claims.
As we have emphasized, the Supreme Court of North Carolina has decided that a violation of section 58-63-15(1) of the IUT-PA constitutes a violation of the UDTPA. See Jefferson-Pilot Life Ins. Co. v. Spencer, 336 N.C. 49, 442 S.E.2d 316, 318 (1994). The trial evidence supported the jury’s finding that National Union engaged in conduct constituting a violation of section 58-63-15(1), and that ABT relied on National Union’s misrepresentations to its detriment. Verdict pt. B.l.a. Because a violation of this provision of the IUTPA is a violation of the UDTPA, the district court did not err in concluding that National Union contravened the UDTPA when it misrepresented the terms of the 1997 NU Policy to induce ABT to purchase the 1998 NU Policy. National Union’s challenge to the Judgment on the UDTPA Claim must therefore be rejected.
D.
Finally, National Union challenges the district court’s award of attorneys’ fees to ABT under the UDTPA. See Second Order. Under North Carolina law, a court is entitled to award attorneys’ fees against the losing party in a suit alleging a violation of the UDTPA. See N.C. Gen.Stat. § 75-16.1. A court can do so upon finding willfulness on the part of the party committing the violation, plus an unwarranted refusal to resolve the matter which forms the basis of the suit. See id. Thus, in order to award attorneys’ fees to ABT, the district court was obliged to find the following: (1) that National Union had violated the UDTPA; (2) that it did so willfully, and engaged in an unwarranted refusal to fully resolve the matter forming the basis of the suit; and (3) that the attorneys’ fees being sought were reasonable. See id.
National Union premises its challenge to the attorneys’ fees award on its contention that the district court erroneously concluded that it had violated the UDTPA, and thus had no statutory authority to make an award of fees under the UDTPA. To the contrary, however, the jury’s findings and the court’s conclusions were amply supported by the evidence and the law. See supra Part III.C. In these circumstances, we are unable to say that the court abused *128 its discretion in making an award of attorneys’ fees.[33]
rv.
Pursuant to the foregoing, the Judgment of the district court is affirmed.

AFFIRMED.

. In February 1999, an entity called Louisiana-Pacific Corporation acquired ABT Building Products Corporation and ABTco, Incorporated. Although the parties and the court refer to "ABT” and "Louisiana-Pacific” interchangeably, we refer to them collectively as “ABT.”

. The underlying actions referred to in the Complaint consist of eleven separate class action proceedings and twenty-one individual lawsuits, which had been instituted on behalf of owners of homes on which ABT-manufactured hardboard siding had been installed.

. The Verdict is found at J.A.2063-66. (Citations herein to “J.A._” refer to the contents of the Joint Appendix filed by the parties in this appeal.)

. Our statement of the relevant factual underpinnings of this dispute summarizes the evidence in the light most favorable to ABT. See Babcock v. BellSouth Adver. & Publ’g Corp., 348 F.3d 73, 75 n. 1 (4th Cir.2003).

. The 1997 NU Policy is found at J.A. 1408-45.

. As pertinent here, the 1997 NU Policy defines “Property Damage” as "[p]hysical injury to tangible property, including all resulting loss of use of that property.” 1997 NU Policy § IV.K.l. It defines an "Occurrence” as "an accident, including continuous or repeated exposure to conditions, which results in ... Property Damage neither expected nor intended from the standpoint of the insured.” Id. § IV.H.l. It also provides that "[a]ll such exposure to substantially the same general conditions shall be considered as arising out of one Occurrence.” Id.

.The 1997 NU Policy defines “Your Product” as "[a]ny goods or products ... manufactured [or] sold ... by ... you.” 1997 NU Policy § IV.M.l.

. The Rovelli Email was admitted into evidence as Plaintiff's Exhibit 46. It specified the following:
As the policy looked on the system and on the Dec page, I had originally assumed it was a one year deal. However, after I requested renewal information, I noticed that buried within the policy were two endorsements, one giving it a multi-year term from 1/01/97 to [1/31/2000], and the other providing annual installments of $58,980. I started to look into the file, noticed that there were class-actions outstanding. My next step was with the broker, who was also unaware that this was a multi-year policy. I received and reviewed their annual report and noticed not only a reoccurrence of the class-actions but a significant change in exposure, which was not given as a caveat in the policy, but I underwrote anyway.
PL’s Ex. 46.

.Insurers other than Wausau and National Union provided ABT with liability coverage for periods before January 1, 1997. Because many of the underlying actions related, at least in part, to hardboard siding that had been installed before January 1, 1997, ABT's insurers for those earlier periods were kept abreast of the settlement negotiations on the underlying claims.

. By the time of the trial of this case, Dr. Sullivan had revised his estimate of the total cost of the proposed settlement slightly upward, to $42.8 million.

. The Wausau Settlement is found at J.A. 1792-1802.

. The Foster Settlement is found at J.A. 1803-2036.

. The term "Replacement Cost" is defined in the Foster Settlement as
the average cost per square foot of surface area of Siding ... as agreed upon by the Parties with reference to current R.S. Means Co. data, including all materials, labor and incidental costs as required to remove, replace and repair Siding panels or boards that have sustained Damage ... with new Siding and to repaint and otherwise restore the exterior of the Property to the extent reasonably necessary to make the repair cosmetically acceptable.
Foster Settlement ¶ 1.48.

. The damage award formula used to determine the appropriate payment is set forth in the Foster Settlement as follows: "A = [ (CD) x (RC) ]-D, where A is the Damage Payment, CD is the amount of Compensable Damage, RC is the Replacement Cost, and D is the applicable Deductions." Foster Settlement ¶ 1.19(a).

.Of note, AIG Vice President Gregnoli testified at trial that "it was obvious to me that the umbrella was going to be impacted by these hardboard siding claims,” that National Union was "going to pay substantially,” and that it would have to pay "a significant amount of money into defending these type of claims.” J.A. 887-89.

. The jury found in favor of ABT on all the questions submitted to it except one: "Did National Union fail to make a reasonable investigation of the damages claimed in the homeowner lawsuits against ABT[] or the coverage provided for those claims under the National Union policy?” Verdict pt. B.l.b. On this inquiry, the jury's answer was "No.” Id.

. The district court initially entered its Judgment on September 22, 2004, and, sua sponte, entered an Amended Judgment on September 30, 2004, correcting certain clerical errors. Our references to the "Judgment” are to the Amended Judgment, found at J.A.2056-66.

.ABT was required by North Carolina law to make a choice between its recovery on the UDTPA Claim and the Verdict’s awards on the Bad Faith and Punitive Damages Claims. See Ellis v. N. Star Co., 326 N.C. 219, 388 S.E.2d 127, 132 (1990). In exercising this choice, ABT decided to accept the treble damage award of $11.7 million under the UDTPA, instead of the $3.9 million award on the Bad Faith Claim and the $7.5 million award on the Punitive Damages Claim. The Judgment provides, however, that if the UDTPA Claim award is overturned on appeal, ABT may elect to recover its awards on the Bad Faith and Punitive Damages Claims, and may move to amend the Judgment to reflect that election.

.In. its brief on appeal, ABT explains that it proposed the $3 million declaration in an effort to simplify the administration of the Declaratory Provisions, and that its proposal actually benefitted National Union:
The three-year indemnity total was proposed by [ABT] (and adopted by the Court without objection by National Union) to simplify the declaratory judgment payment schedule, even though this arrangement delays the start of the payments to [ABT], Technically, year-by-year indemnity calculations should be used, with National Union required to start its 1997 policy-year indemnity payments as soon as Foster claims for siding installed during that year top $1 million, and then to start and pay its 1998 and later indemnity contributions after a separate calculation is made for each subsequent year. To facilitate the administration of these indemnity payments, the [Judgment] aggregates the three separate $1 million underlying limits.
Appellees' Br. 39.

. The First Order is found at J.A. 2249-64.

. The Second Order is found at J.A. 2265-71.

. The $3 million declaration provides that "National Union's obligation to indemnify [ABT] for future Foster settlement claims shall begin after [ABT] has paid Foster settlement costs or ... claims attributable to installations during the National Union coverage period equal to the $3,000,000 in underlying insurance coverage.” Judgment 6 (emphasis added).

. National Union also suggests that ABT had a total of $4 million in underlying coverage during the 1997 NU Policy's coverage period, contending that the 1998 Wausau Stub Policy was subject to its own $1 million limit. That position, however, ignores the Underlying Insurance Clause, which provides that National Union's coverage obligations are measured as if ABT’s underlying coverage had remained in full force and effect throughout the coverage period of the 1997 NU Policy, regardless of whether ABT in fact maintained such coverage. See 1997 NU Policy § VI.I. As noted above, if ABT's underlying coverage for hardboard siding losses had remained in effect, ABT would have had three successive $1 million annual limits, the second of which subsumes the period during which the 1998 Wau-sau Stub Policy was effective. Because of the Underlying Insurance Clause, those three $1 million annual limits are the only ones pertinent to the calculation of National Union's coverage obligations.

. Until this appeal, National Union consistently maintained that the 1997 NU Policy, although effective for thirty-seven months and never cancelled, covered only the thirteen-month period from January 1, 1997, through January 31, 1998. The jury determined otherwise, however, see Verdict pts. B.l.a, E.2, and that finding is not challenged on appeal. National Union’s present contention that the 1997 NU Policy requires the exhaustion of underlying limits for both 1998 and 1999 thus could be deemed an expedient afterthought.

. The district court’s ruling that the 1997 NU Policy required ABT to exhaust only $1 million in underlying coverage to trigger National Union's defense obligations is consistent with the view of National Union’s own officials. For example, Ms. Tersy, the Director of Excess Casualty Claims for National Union's claims administrator, acknowledged in her trial testimony that she "knew that the Wausau policy that was underneath the National Union policy was only for a million dollars.” J.A. 506.

. Even if the district court had required ABT to exhaust all three of its successive annual $1 million underlying limits before it was entitled to a defense under the 1997 NU Policy, we would not be bound by such a ruling. We review a trial court's conclusions of law de novo, and, under North Carolina law, we would inquire into whether its interpretation of the Policy was consistent with the parties’ intent. See Register v. White, 358 N.C. 691, 599 S.E.2d 549, 553 (2004). National Union does not maintain that the parties actually intended the Policy to operate in the manner now urged, and for apparent good reason, since the parties could not plausibly have intended an excess insurance policy that would provide ABT no coverage until its third year, at the earliest, and none at all unless ABT happened to incur more than $ 1 million in covered losses in each of its three annual underlying coverage periods. And such a position is rendered even more implausible by the events surrounding National Union’s issuance of the 1998 NU Policy. See supra Part I.B.2; infra Part III.C.

. In addition to its narrow view of the term "payment of claims,” National Union seeks to rely on Brown v. Lumbermens Mutual Casualty Co., 326 N.C. 387, 390 S.E.2d 150 (1990), to avoid its defense duty. The Brown court, in interpreting an ambiguous defense clause in an automobile insurance policy, concluded that the insurer’s duty to defend persisted until the lawsuit against its insured culminated in a settlement or judgment, even if the insurer had already paid its policy limits. National Union contends that, under Brown, Wausau's duty to defend ABT was never extinguished and National Union's duty to defend thus never arose. That reasoning is flawed, however, since two insurers can possess concurrent defense duties to a common insured, see 22 Appleman on Insurance § 136.10 (2d ed.2003), and National Union's duty to defend would have arisen upon the exhaustion of the 1997 Wausau Policy even if Wausau’s defense duty continued thereafter. Moreover, the court in Brown reached its result by interpreting an ambiguous policy provision against the issuing insurer, as North Carolina law requires. See Brown, 390 S.E.2d at 154. The insurance provision in dispute here is not ambiguous, and, even if it were, Brown would support the district court’s interpretation of the 1997 NU Policy, not that of National Union.

. On the "Property Damage" aspect of the evidence and issues presented to the jury, the district court relied on the Your Product Exclusion and the definitions in the 1997 NU Policy to frame its jury instructions. First, the court instructed the jury on the significance of the Your Product Exclusion:
National Union argues that the "your product” exclusion in the policy operates to exclude a percentage of ABT's costs under the Foster settlement.... The policy states that, "This insurance does not apply for the property damage to your product arising out of it or any part of it.”
J.A. 1368. The Court then instructed the jury on the 1997 NU Policy’s definitions of "Property Damage” and “Your Product”:
"Property damage” means ... physical injury to tangible property.... "Your product” is defined as ... any goods or products other than real property manufactured, sold, handled, distributed or disposed of by you....
Id. at 1368-69. Finally, the court instructed the jury on its task in applying the contract terms to the evidence:
You will be asked whether [the] your product exclusion in the National Union policy operates to exclude a percentage of ABT’s costs under the Foster settlement. If you find that a percentage is excluded, you will need to determine what percentage of the underlying liability is excluded and that which relates to third-party property damage. If it applies, the "your product” exclusion excludes coverage only for the actual costs of the replacement siding itself. [The] "[y]our product” exclusion does not apply to the cost of removing the defective siding and installing and painting the new siding. Moreover, the "your product” exclusion does not apply to the cost of any other work on the home, including the repair or replacement of any other component of the wall system or house.
Id. at 1369-70. Of note, National Union does not claim any appellate error on the jury instructions.

. National Union makes a related contention that the Foster Settlement's means of distributing the settlement funds precludes any conclusion that such payments are in part for covered third-party property damages. A judicial assessment of post-settlement coverage disputes generally turns on the types of underlying claims that have been settled, and not necessarily on the agreed-upon mode of distributing settlement funds. See Allan D. Windt, Insurance Claims & Disputes 6.31 (4th ed. Supp.2006) (noting “the existence of coverage should depend on what claims were settled; that is, it should depend on why the money was paid”). Here, the evidence sufficiently demonstrated that the Foster Settlement was intended to compensate the class members’ claims for the third-party property damages.

. Even if the Vick decision were applicable here, it does not support National Union's position that the Foster claims did not arise from an "Occurrence.” See 52 F.Supp.2d at 584-86. In Vick, the court recognized that, although the construction company's improper application of a waterproofing system was not an “accident,” if Vick had been sued for damages to furniture in the building caused by the improperly applied system, "such an event may very well [have been] an 'accident' triggering coverage.” Id. at 586.

. The trial court’s instruction on the "Occurrence” issue, in pertinent part, was as follows:
You must determine whether the property damage was expected or intended from the standpoint of ABT.... An act is expected or intended only if the resulting injury, as well the act, were intentional. In other words, to carry its burden of proof, National Union must prove on this issue not only that ABT ... intended to sell siding for homes but that ABT ... intended to damage the homes of its customers. Under North Carolina law an act will be considered expected or intended where the policyholder's motivation was to cause property damage or when the policyholder expects that its acts will cause property damage.
J.A. 1370.

. In a related contention, National Union maintains that, even if its liability to ABT was *126 reasonably clear, ABT was unable to establish the aggravating circumstances required to support the UDTPA Claim. This assertion is also without merit. It is true, of course, that a bad faith refusal to settle a claim cannot rest merely "on honest disagreement or innocent mistake.” Dailey v. Integon Gen. Ins. Corp., 75 N.C.App. 387, 331 S.E.2d 148, 155 (1985); see also Olive v. Great Am. Ins. Co., 76 N.C.App. 180, 333 S.E.2d 41, 46 (1985). Under the evidence here, however, the district court was justified in ruling that National Union’s failure to settle was more than "honest disagreement or innocent mistake,” and was instead a violation of section 58-63-15(1 l)(f) and "inherently unfair” under North Carolina law.

. In awarding attorneys' fees, the court found that National Union had willfully contravened the UDTPA and engaged in an unwarranted refusal to fully resolve its dispute with ABT. The court also determined that the costs and fees sought by ABT were reasonable, and it spelled out its factual findings pursuant to North Carolina law. See United Labs., Inc. v. Kuykendall, 335 N.C. 183, 437 S.E.2d 374, 381-82 (1993). More specifically, the court observed that the litigation against National Union involved complex issues requiring significant legal work, including a nine-day jury trial. The court found ABT's counsel to be skilled and competent, and it found their hourly rates to be "reasonable, customary and comparable" for the representation involved. Second Order 3, 5. Finally, the court noted that ABT had obtained an "extraordinarily high degree of success,” a factor that weighed strongly in favor of making the attorneys’ fees award. Id. at 6.